636 So.2d 18 (1994)
In Re CERTIFICATION OF CONFLICT IN MOTIONS TO WITHDRAW FILED BY PUBLIC DEFENDER OF THE TENTH JUDICIAL CIRCUIT.
No. 82782.
Supreme Court of Florida.
April 21, 1994.
*19 J. Marion Moorman, Public Defender, Tenth Judicial Circuit, Bartow, and John Beranek, Aurell, Radey, Hinkle, Thomas & Beranek, Tallahassee, for petitioner.
Robert A. Butterworth, Atty. Gen. and Richard E. Doran, Asst. Atty. Gen., Tallahassee, for respondent.
Bennett H. Brummer, Public Defender, and Louis Campbell, Asst. Public Defender, Eleventh Judicial Circuit, Miami, amicus curiae, for FL Public Defender Ass'n, Inc.
Suzanne T. Smith, Sr., Asst. County Atty., Pinellas County Attorney's Office, and Susan H. Churuti, Pinellas County Atty., President, FL Ass'n of County Attys., Inc., Clearwater, amicus curiae, for Pinellas County and FL Ass'n of County Attys., Inc.
Robert A. Ginsburg, Dade County Atty., and Michael S. Davis, Asst. County Atty., Miami, amicus curiae, for Metropolitan Dade County.
William J. Robert and William Paul Huey, Roberts & Egan, P.A., Tallahassee, amicus curiae, for FL Ass'n of Counties, Inc.
Cory J. Ciklin, Asst. County Atty., Palm Beach County Attorney's Office, West Palm Beach, amicus curiae, for Palm Beach County.
SHAW, Justice.
We have for review Order on Motions to Withdraw, 622 So.2d 2 (Fla. 2d DCA 1993), which affects a class of constitutional officers. We have jurisdiction. Art. V, § 3(b)(3), Fla. Const. We approve the district court's decision.
This is another in the line of cases involving the workload of the Public Defender of the Tenth Judicial Circuit (Public Defender), who serves indigent clients seeking appellate review in the Second District Court of Appeal. See Skitka v. State, 579 So.2d 102 (Fla. 1991); In re Order on Prosecution of Criminal Appeals, 561 So.2d 1130 (Fla. 1990). In March 1993, the Public Defender filed a motion in the Second District Court to withdraw from 249 overdue appeals because of conflict caused by an excessive caseload. In April, he moved to withdraw from an additional 133 cases. The court met en banc and entered a decision in April expressing its concerns and noting that fact-finding was necessary:
We have concluded that we can no longer resolve these motions without an adequate factual record. The issues raised by these motions are too complex to be resolved summarily. The result we will ultimately reach will affect too many people and the fiscal affairs of too many governments. The appellants in these cases are constitutionally entitled to timely appeals. An untimely appeal may be little better than no appeal at all when, for example, a sentence expires before the appeal is complete. Moreover, an inundated attorney may be only a little better than no attorney at all. The counties on the other hand want this problem solved without additional demand on already overburdened budgets.
*20 Order on Motions to Withdraw, 622 So.2d at 3.
The district court called for appointment of a retired judge to sit as commissioner at an evidentiary hearing and submit a report containing findings of fact and conclusions. The commissioner was directed to use criteria set forth in In re: Order on Prosecution of Criminal Appeals, and address the following concerns:
1. Whether the productivity of the appellate division of the Public Defender's office is within an acceptable range.
2. Whether all of the attorneys assigned to that division are working exclusively on appellate matters.
3. Whether the Public Defender has taken adequate steps to assure that repetitive issues are handled efficiently.
4. Whether the Public Defender uses a team approach to maximize the efficiency of the briefing process.
5. Whether there are steps that the Public Defender, the Attorney General, and this court could collectively take to assure timely appellate review of indigent appeals.
6. Whether there are other steps which could be taken to allow for the timely prosecution of indigent appeals without transferring the cost for such appeals to the counties.
7. Ignoring earlier motions to withdraw filed with this court, whether the cases selected for the present motions have been chosen for any particular reason that should be made known to the court.
Order on Motions to Withdraw, 622 So.2d at 4.
The Florida Supreme Court appointed a retired judge to sit as Special Commissioner, and a four-day evidentiary hearing was held in August. The Public Defender presented eighteen witnesses; the counties within the Second District presented one; and the Attorney General presented one. The commissioner issued his report on September 7, making numerous findings, including the following:
 Your commissioner finds that the productivity of the Public Defender's office is definitely within an acceptable range. Only one other appellate public defender's office exceeded the productivity of Mr. Moorman's office.
 The cases which are the subject of all pending motions to withdraw were selected solely because the initial briefs are in excess of sixty days overdue.
 The Second District is unique in that it has the largest population, the largest civil and criminal caseloads, the highest jury trial rate ... in criminal cases, the highest number of appeals assigned to a Public Defender, and the highest criminal appeal backlog within the office of a Public Defender.
 During calendar year 1992, there were seventeen attorneys assigned exclusively to noncapital appeals. The total number of briefs filed by these attorneys during that period was 1,067. The average per attorney was 62.7 briefs.
 The National Advisory Commission on Criminal Justice Standards and Goals developed standards in 1973 which remain in effect and are numerical in nature. These standards recommend that an attorney such as a public defender handle no more than twenty-five appeals per year... . These standards were recently endorsed by the American Bar Association Committee studying the criminal justice system with only slight modifications.
 The State of Florida promulgated a workload measurement system called the Florida Funding Formula. This formula was designed to determine staffing needs and budgetary requirements for Public Defenders and, at fifty appeals per year, these were the [most burdensome] standards in the country.
 Mr. Robert Spangenberg, an attorney and expert on the indigent defense crisis and the provision of legal services to indigent defendants, did a survey of other states and testified to a representative sampling of briefs filed per attorney. In the majority of states, attorneys file between twenty and thirty initial briefs per year. None of the surveyed states do more than fifty cases per year. [Ohio, 27; California, 26; North Carolina, 30; Hawaii, *21 12; Washington, 42; New York, 20 to 22; Illinois, 24; Michigan, 36; Colorado, 24; New Hampshire, 20 to 25; Massachusetts, 20; Arizona, 25.]
 Based on unrefuted evidence from the Honorable Elvin L. Martinez, member of the Florida House of Representatives and past chair of the House Criminal Justice Appropriation Committee, the court finds that the Florida Legislature devised its own approach to the funding of the Public Defender offices. Each year the twenty State Attorneys from each circuit submit their budget request to the office of the Governor and these are eventually placed before the Legislature along with the separate funding requests under the formula by the Public Defenders. The Legislature initially considers the total amount requested by the State Attorneys. After deciding on the amount to be appropriated to the State Attorneys, the Legislature then appropriates approximately fifty percent of that amount for the operation of the Public Defenders. In retrospect one can compute a percentage of the funding formula but the appropriations process is in fact driven entirely by the budgetary requests and appropriations for State Attorneys. The Florida Funding Formula becomes a purely hypothetical or artificial exercise in terms of generating funding.
The commissioner concluded that "[t]he public defenders of the Tenth Circuit function under excessive caseloads and relief should be granted." He recommended that the Public Defender be allowed to withdraw from "those cases in which the records were transmitted in February, March, April, and May 1993," and from "cases received in September, October, and November 1993." The commissioner also made several long-term suggestions:
A. Increased funding for more [assistant public defenders], support staff, and computerization.
B. Adoption of a prospective withdrawal procedure similar to that used in the First District Court of Appeal to allow the Public Defender to withdraw early based on a recognition that the cases cannot be timely handled in the future.
C. Adoption of binding caseload/workload standards based upon the Florida Formula approach. These standards should be made a part of the Florida Rules of Judicial Administration or the Florida Criminal and Appellate Rules.
D. Increased pro bono representation by private counsel.
E. Appointment and funding of the study commission recommended by the Florida Supreme Court in In re: Order on Prosecution of Criminal Appeals, 561 So.2d at 1138 n. 7.
F. The Public Defender should constantly review the productivity of his office to ensure that all improvements possible are being implemented to continue to increase the efficiency of his office in handling indigent criminal appeals.
When presented with the commissioner's report, the Second District Court sitting en banc issued an order "receiving" the report and granting the motions to withdraw. Despite the court's ruling in his favor on withdrawal, the Public Defender sought review to resolve several issues that he felt compromised his autonomy as a constitutional officer.
As his first point, the Public Defender claims that the district court should not have utilized a commissioner and held an evidentiary hearing on his motions to withdraw. He feels that this sets a dangerous precedent in that it allows the court, counties, and state attorneys to interfere in the operation of his office. He contends that his motions were sufficiently substantiated by supporting documents and should have been summarily granted.
We conclude that the court did not abuse its authority in determining that fact-finding was necessary. This Court said in Skitka v. State, 579 So.2d 102 (Fla. 1991), that a district court is not obligated to accept automatically a public defender's request for withdrawal due to overload:
We acknowledge the public defender's argument that the courts should not involve themselves in the management of public defender offices. At the same time, we do not believe that courts are obligated *22 to permit the withdrawal automatically upon the filing of a certificate by the public defender reflecting a backlog in the prosecution of appeals.
Id. at 104. Here, there is sufficient evidence supporting the court's determination that fact-finding was necessary. The Public Defender's history of seeking withdrawal, the sheer number of cases affected by the present motions, and the substantial financial burden that would fall upon the counties for funding conflict counsel all mandated careful scrutiny of the motions to withdraw.
Once the district court determined that fact-finding was necessary, it had several options. It could refer the motions to a single circuit court, refer them to a number of circuit courts throughout the district, or appoint a commissioner. See Rose v. Palm Beach County, 361 So.2d 135, 137 (Fla. 1978) ("Every court has inherent power to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction, subject to valid existing laws and constitutional provisions."). The district court properly concluded that to refer the motions to the circuit courts was untenable:
One method to resolve these matters would be to refer the motions to the circuit courts in the counties within the jurisdiction of the Second District for fourteen separate hearings. We are persuaded that scheme would likely lead to conflicting results. Neither do we feel we should send the matter to only one circuit court for a resolution that could affect counties outside that circuit.
Order on Motions to Withdraw, 622 So.2d at 3. Accordingly, the court acted properly in seeking appointment of a commissioner to conduct the hearing. Cf. Baggett v. Wainwright, 229 So.2d 239, 244 (Fla. 1969) ("If factual determinations are deemed necessary [in habeas proceedings], the appropriate district court needs merely to ... appoint a commissioner to make the necessary factual determinations.").
In conducting its inquiry, the district court made no attempt to "micromanage" the affairs of the Public Defender's office. The commissioner administered the presentation of testimony and other evidence concerning the filing of appeals and then evaluated that information solely to determine the factual basis for the Public Defender's claim of conflict. The district court in turn simply acted on the commissioner's report. Cf. Day v. State, 570 So.2d 1003 (Fla. 1st DCA 1990) (First District Court of Appeal assessed similar information in evaluating Public Defender's request for withdrawal from 300 cases due to overload.).
As his second point, the Public Defender claims that the district court, instead of simply "receiving" the commissioner's report and granting the motions to withdraw, should have formally approved the commissioner's findings. We conclude, however, that in receiving the report and granting the motions to withdraw, the district court implicitly approved the findings. Competent substantial evidence supports the findings.
As his final point, the Public Defender contends that this Court should take action on the suggestions contained in the commissioner's report, including the adoption of a prospective withdrawal system that will cut delay in conflict cases, and the adoption of maximum workload standards for public defenders. We decline to take such action, but instead refer the commissioner's suggestions to the appropriate committees of The Florida Bar for study. Cf. In re Order on Prosecution of Criminal Appeals, 561 So.2d at 1138 n. 7 (This Court recommended referral of the funding mechanism for public defenders and state attorneys to an appropriate commission of the legislature.).
In sum, we approve the procedure employed by the district court under the special circumstances of this case. We note that the court did not attempt to interfere in the management of the Public Defender's office, or attempt to instruct the Public Defender on how best to conduct his affairs. The court's inquiry was limited to an objective assessment of the Public Defender's practices in processing appeals in order to confirm that a factual basis existed for the Public Defender's motions.
Accordingly, we approve both Order on Motions to Withdraw and the district court's order receiving the commissioner's report. *23 A full copy of the report is appended to this opinion.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, GRIMES and KOGAN, JJ., concur.
HARDING, J., concurs with an opinion, in which BARKETT, C.J., and KOGAN, J., concur.
HARDING, Justice, concurring.
I concur with the majority that the court has the authority to make inquiry when a public defender seeks to withdraw in a number of cases as the petitioner did here. I write only to urge that this authority be exercised sparingly and reluctantly. In fact, I would have granted the public defender relief on the showing he made with his original petition to withdraw.[1]
The public defender is a constitutional officer. Art. V, § 18, Fla. Const. The public defender is charged not only with representing indigent defendants, but also in managing an office, directing personnel, and administering a budget. Public defenders are subject to grand jury as well as media scrutiny if there is impropriety. They are also responsible to the electors at the polls. They should be accorded great independence in making the decisions to carry out their charge. It is only when the decision of a public defender impacts significantly upon the court that any inquiry should be made.
Courts should be reluctant to get into the micromanagement of a public defender's office. See Skitka v. State, 579 So.2d 102, 104 (Fla. 1991). Thus, I would urge that a request to withdraw, such as the one made by the petitioner, should come with a strong presumption of correctness and should require little evidence to support a ruling granting relief. Here, the report of the commissioner turned out to be of utmost benefit to the public defender and vindicated the position he had taken seeking to withdraw. Thus, it may be difficult to understand why the public defender would complain about the utilization of the commissioner and the fact-finding process. The issue here is who should exercise authority and make decisions about whether the public defender has the resources to perform all the responsibilities required by law. Except in the most unusual circumstances, I would leave that decision with the public defender and as a court would not second-guess it.
BARKETT, C.J., and KOGAN, J., concur.

APPENDIX

In the District Court of Appeal Second District, State of Florida

September 7, 1993

Case No.

In re:

Motion to Withdraw Filed by Tenth Circuit Public Defender.

COMMISSIONER'S REPORT
This matter was referred to the undersigned as a Commissioner to hear evidence and make findings of fact, conclusions, and recommendations pursuant to the order of the Second District Court of Appeal of April 22, 1993. At issue are motions to withdraw and petitions for mandamus by the Public Defender based on asserted excessive caseloads in 382 separate appellate cases. These 382 cases were the subject of motions to withdraw and petitions for mandamus filed in March and April 1993. Additional motions have been filed in the months between the District Court's order of April 22, 1993, and the hearing which began on August 16, 1993. Pursuant to the District Court's order, the fourteen counties in the Second District geographic area were invited to participate along with all other Public Defenders, State Attorneys, *24 and the Florida Attorney General. The fourteen counties formed a loose alliance and Hillsborough, Pinellas, and Manatee County took the lead in representing the interests of some but not all the counties. During the actual hearing, county attorneys were present from Hillsborough, Manatee, Sarasota, and Pinellas Counties.

Concerns of the Court and the Pending Motions
The Second District Court of Appeal stated the following seven concerns:
1. Whether the productivity of the appellate division of the Public Defender's office is within an acceptable range.
2. Whether all of the attorneys assigned to that division are working exclusively on appellate matters.
3. Whether the Public Defender has taken adequate steps to assure that repetitive issues are handled efficiently.
4. Whether the Public Defender uses a team approach to maximize the efficiency of the briefing process.
5. Whether there are steps that the Public Defender, the Attorney General, and this court could collectively take to assure timely appellate review of indigent appeals.
6. Whether there are other steps which could be taken to allow for the timely prosecution of indigent appeals without transferring the cost for such appeals to the counties.
7. Ignoring earlier motions to withdraw filed with this court, whether the cases selected for the present motions have been chosen for any particular reason that should be made known to the court.
The court's order did not restrict consideration to these concerns alone. The immediate question is of course the 382 pending motions. The transcript of the full hearing has been ordered and will be filed for record purposes. The undersigned commissioner recommends that the 382 motions be granted.
Your commissioner finds that the productivity of the Public Defender's office is definitely within an acceptable range. Only one other appellate public defender's office exceeded the productivity of Mr. Moorman's office.
All of the attorneys assigned to the appellate division are working exclusively on such matters except for fielding questions from trial attorneys on issues of law, handling weekend and holiday first appearances on a rotational basis with all other assistant Public Defenders, and occasionally, jail inspections. From your commissioner's former service as a circuit judge, I find that rotational service on weekend and holiday first appearances does not interfere with normal duties. The testimony received estimated that 99.5% of appellate attorneys' time was devoted to appeals. I accept that testimony.
Your commissioner is not completely satisfied that adequate steps have been taken to assure that repetitive issues are being handled efficiently. Prior to July or August 1993, the Office of the Public Defender for the Tenth Judicial Circuit did not keep time records. Therefore, it is impossible to evaluate the relative productivity, i.e., speed and efficiency with which the various assistant appellate public defenders work. As a corollary, it could not be determined how much time each assistant devoted to an assigned case. Mr. Moorman is in the process of developing a time-keeping system.
The Public Defender does not use a team approach in the actual briefing process. Testimony was received that this would actually delay the briefing process because each team member would need to become familiar with the record. The system used requires that each brief be reviewed by another assistant public defender prior to filing, not only to check grammar and spelling but to review legal citations and made [sic] suggestions for improvement in overall content. For the most part, sharing of ideas and prior legal research between appellate attorneys is done informally and efficiently. There are also regularly scheduled review sessions on current case law known as Florida Law Weekly Reviews. At present, greater use of a more formal team approach would not enhance the *25 efficiency of the Public defender's brief writing. This finding is based on the consistent testimony of the numerous lawyers who testified, many of whom were not associated with the Tenth Circuit office. Most of the witnesses were simply unfamiliar with a multiple lawyer team approach to brief writing.
When an illegal sentence is the only issue in an appeal, the Public Defender's and Attorney General's offices could stipulate to a resentencing, with this court's permission, without going through the whole briefing and decision process. In order to assure the trial court's cooperation it may require an order of this court finding the sentence illegal.
No evidence was presented concerning other steps that could be taken in handling indigent appeals without transferring the cost to the counties.
The cases which are the subject of all pending motions to withdraw were selected solely because the initial briefs are in excess of sixty days overdue. The Public Defender's March 1993 motions related to forty-four percent of the cases received in October. Thereafter, the Public Defender has moved to withdraw from all cases received when the initial briefs are in excess of sixty days overdue. Cases sought to be withdrawn from are based upon the number of records received from the respective counties which cannot be briefed timely.
Pursuant to section 27.51(4), Florida Statutes (1991) the elected Public Defenders located in the second, seventh, nineteenth, eleventh, and fifteenth judicial circuits are assigned the additional duty of handling all indigent criminal appeals within their respective district court's jurisdiction. Thus the Tenth Circuit Public Defender, Mr. J. Marion Moorman, has the responsibility for handling all indigent criminal appeals in the Second District Court of Appeal upon designation by the respective trial Public Defenders. The Second District is unique in that it has the largest population, the largest civil and criminal caseloads, the highest jury trial rate (4.24%) in criminal cases, the highest number of appeals assigned to a Public Defender, and the highest criminal appeal backlog within the office of a Public Defender.
These are problems of long-standing. See Skitka v. State, 579 So.2d 102 (Fla. 1991); In re: Order on Prosecution of Criminal Appeals by the Tenth Judicial Circuit Public Defender, 561 So.2d 1130 (Fla. 1990). Although this proceeding technically concerned only the motions to withdraw and petitions for mandamus in the Second District Court of Appeal, the Commissioner was furnished with evidence concerning the four other appellate Public Defender offices. Either the elected Public Defender or the head of the appellate division from each of these offices testified to the local situation in the First, Third, Fourth, and Fifth Districts. The Commissioner was thus given a statewide view of the overall workload problem. Generally, the workload/caseload demands on the Public Defenders in Florida are extremely high.

Tenth Circuit Personnel and Organization
Mr. J. Marion Moorman, the Public Defender of the Tenth Circuit, has both trial and appellate responsibilities. His office is divided into trial and appellate divisions and generally the lawyers do not cross lines between trials and appeals. Mr. Moorman is the overall supervisor of the office. His executive director is Ms. Holly Stutz. Ms. Deborah Brueckheimer is the head of the noncapital appeals division. Generally the appellate Public Defenders have substantial experience in their field and this is not an entry level position. The appellate division is further divided between capital and noncapital attorneys. Again, these divisions are maintained except for individual instances where a noncapital attorney wishes to gain capital experience and may handle one such capital case. There are fifteen noncapital appellate attorneys located in very cramped quarters in Bartow and two other appellate noncapital attorneys located in Pinellas County. There are five additional attorneys doing capital appeals. There are three secretaries serving the fifteen noncapital appellate attorneys in Bartow. These attorneys are directly managed by Ms. Deborah Brueckheimer who has until recently carried a *26 full appellate caseload in addition to her management responsibilities. A production quota of seven briefs or 1300 record pages per month is enforced. This quota is enforced but not without exception.

1992 Caseload/Workload for the Second District Court of Appeal  Tenth Circuit
During calendar year 1992, there were seventeen attorneys assigned exclusively to noncapital appeals. The total number of briefs filed by these attorneys during that period was 1,067. The average per attorney was 62.7 briefs. All Tenth Circuit attorneys who testified stated they considered the caseload excessive.
For purposes of this analysis, the word "brief" included initial briefs, answer briefs in state appeals, Anders briefs, dispositive motions, and Florida Supreme Court merit briefs. Not included in the definition of "brief" were reply briefs, supplemental briefs, extraordinary writs, Supreme Court jurisdictional briefs, oral arguments, or motions for rehearing.
The Tenth Judicial Circuit's overall productivity in noncapital appeals in 1992 was as follows:

 885 initial briefs
 53 answer briefs in state appeals
 242 Anders briefs
 82 reply briefs
 49 Florida Supreme Court jurisdictional
 appeals
 30 Florida Supreme Court merit briefs
 79 dispositive documents
 250 other case actions such as motions
 for rehearing, supplemental briefs,
 and extraordinary writs
 53 oral arguments

Included in the totals listed above are briefs filed by attorneys normally assigned to capital appeals as follows:

 77 initial briefs
 9 Anders briefs
 13 reply briefs
 1 dispositive document

State and National Standards
Considerable expert evidence and documentary evidence was presented on the standards which have been adopted by state and national groups. Because similar problems have been faced before, attempts have been made to reach a consensus on just how many cases a public defender should be able to handle in one year. In addition, nonnumerical standards have been adopted.
The workload standard adopted by the American Bar Association is Standard 5-5.3, Workload which provides as follows:
(a) Neither defender organizations, assigned counsel nor contractors for services should accept workloads that, by reason of their excessive size, interfere with the rendering of quality representation or lead to the breach of professional obligations. Special consideration should be given to the workload created by representation in capital cases.
(b) Whenever defender organizations, individual defenders, assigned counsel or contractors for services determine, in the exercise of their best professional judgment, that the acceptance of additional cases or continued representation in previously accepted cases will lead to the furnishing of representation lacking in quality or to the breach of professional obligations, the defender organization, individual defender, assigned counsel or contractor for services must take such steps as may be appropriate to reduce their pending or projected caseloads, including the refusal of further appointments. Courts should not require individuals or programs to accept caseloads that will lead to the furnishing of representation lacking in quality or to the breach of professional obligations.
"Workload" as used in this standard, is to be distinguished from the more narrow term "caseload." Caseload is the number of cases assigned to an attorney at any given time. Workload is the sum of all work performed by the individual attorney at any given time, which includes the number of cases to which the attorney is assigned, but also includes other tasks for which that attorney is responsible.
The National Advisory Commission on Criminal Justice Standards and Goals developed standards in 1973 which remain in effect and are numerical in nature. These standards recommend that an attorney such *27 as a public defender handle no more than twenty-five appeals per year. The standard of the National Advisory Commission is contained at Courts 13.12 (1973) as follows:

 150 felonies per attorney per year; or
 400 misdemeanors per attorney per year;
 or
 200 juvenile cases per attorney per year;
 or
 200 mental commitment cases per attorney
 per year; or
 25 appeals per attorney per year.

These standards were recently endorsed by the American Bar Association Committee studying the criminal justice system with only slight modifications. See ABA, Special Committee on Criminal Justice in a Free Society, Criminal Justice in Crisis, 43 (1989).
The State of Florida promulgated a workload measurement system called the Florida Funding Formula. This formula was designed to determine staffing needs and budgetary requirements for Public Defenders and, at fifty appeals per year, these were the highest standards in the country. They provided that a Public Defender is assumed to be able to handle the following annual caseloads:

 8 capital felonies; or
 200 noncapital felonies; or
 250 juvenile; or
 250 mental health; or
 5 capital appeals; or
 50 noncapital appeals.

These standards are contained in a publication by the Office of the State Court Administrator, State Attorney  Public Defender Workload Project: Descriptive Information and Circuit Profile (Florida Supreme Court January 1981).
The Florida Bench/Bar Commission recently adopted the Florida Public Defender Association's maximum annual caseload standards in its recommendations to the Supreme Court of Florida. The current caseload standards are as follows:

 3 capital felonies; or
 200 noncapital felonies; or
 400 criminal traffic cases; or
 400 misdemeanor cases; or
 250 juvenile cases; or
 250 mental health cases.

The Commission recommended criminal and appellate procedure rule changes setting maximum caseload standards. See The Necessities of the Times  Facing Challenges in the Legal System; The Report of the Bench/Bar Commission, A Commission Created by the Supreme Court of Florida and The Florida Bar, January 1993.
In preparation for this hearing, Mr. Robert Spangenberg, an attorney and expert on the indigent defense crisis and the provision of legal services to indigent defendants, did a survey of other states and testified to a representative sampling of briefs filed per attorney. In the majority of states, attorneys file between twenty and thirty initial briefs per year. None of the surveyed states do more than fifty cases per year:

 Ohio 27
 California 26
 North Carolina 30
 Hawaii 12
 Washington 42
 New York 20 to 22
 Illinois 24
 Michigan 36
 Colorado 24
 New Hampshire 20 to 25
 Massachusetts 20
 Arizona 25

The Florida Legislature's Funding Approach (50% of State Attorney's Budget)
Based on unrefuted evidence from the Honorable Elvin L. Martinez, member of the Florida House of Representatives and past chair of the House Criminal Justice Appropriation Committee, the court finds that the Florida Legislature devised its own approach to the funding of the Public Defender offices. Each year the twenty State Attorneys from each circuit submit their budget request to the Office of the Governor and these are eventually placed before the Legislature along with the separate funding requests under the formula by the Public Defenders. The Legislature initially considers the total amount requested by the State Attorneys. After deciding on the amount to be appropriated to the State Attorneys, the Legislature then appropriates approximately fifty percent of that amount for the operation of the Public Defenders. In retrospect one can compute a percentage of the funding formula *28 but the appropriations process is in fact driven entirely by the budgetary requests and appropriations for State Attorneys. The Florida Funding Formula becomes a purely hypothetical or artificial exercise in terms of generating funding. The commissioner accepts the testimony of Representative Martinez as true. It was undisputed.

Brief Banks
The Public Defender's office does not possess a formal brief bank. The lawyers do have their own research and brief files, and all lawyers attempt to use and take advantage of each other's research. Although cases are treated individually, there is no attempt to "reinvent the wheel" on every case. A statewide computerized brief bank is presently under development by the Florida Public Defender's Association under the supervision of Mr. Bennett Brummer, Public Defender of the Eleventh Judicial Circuit. The Tenth Circuit Public Defender's Office would increase its efficiency if it had access to a current computerized brief bank. Attempts have been made in the past by the Tenth Circuit to use brief banks and such attempts have often fallen into disuse because of two problems. Initially, compiling the brief banks and daily upkeep are very time consuming. Secondarily, brief banks must be continuously purged of old materials which become dated and clutter the data base. Criminal appellate issues tend to be "hot issues" until resolved by the courts or the legislature and then quickly go out of style. Clearly, at this point in time, the new statewide system should be used and efficiency will be increased but only minimally, and clearly not to the extent of solving the backlog problem.

Computerization
Under Chapter 27 of the Florida Statutes the counties have the responsibility of furnishing the physical quarters for the Public Defenders. Counties may also furnish office equipment such as computers. The Tenth Circuit presently has computers purchased through its state budget available to all appellate attorneys who desire them. Even though available, certain attorneys choose to dictate or write their briefs by hand. Other attorneys do all of their drafting on a computer and the attorneys who are completely computer literate were of the view that total computer use is the fastest system. Computer literacy also enables an attorney to maintain a private brief bank. The computers in the trial and appellate divisions use different software and this is a disadvantage. None of the computers are networked and the absence of networking reduces efficiency. Generally, computerization, networking, computer literacy, and the simple ability to type increases the efficiency of the lawyer. On the other hand, some of the lawyers who are in fact the most productive appellate specialists still retain old work habits and continue to write or dictate their briefs. In the final analysis, the work habits of the individual attorneys will dictate their ability to use computers.

Other Appellate Public Defenders
Generally, the appellate caseload problem exists in every Public Defender's office in the State of Florida. Without question the Second District situation is the most aggravated followed by the First District which routinely withdraws from cases and has done so for many years. The Fifth District Court of Appeal produces many more briefs per attorney than does any of the other districts but this appears to be due to a low jury trial rate, a substantial number of guilty plea appeals, and a substantial number of Anders briefs being filed on meritless appeals.

The Counties' Law Office Management Consultant
The counties presented the testimony of Mr. Richard Reed who is a consultant on the subject of law office management. Mr. Reed has written extensively for the American Bar Association on the subject of law office economics and billable hours. Without question Mr. Reed is an expert on billing and the generation of income from a private law firm.
If all of Mr. Reed's suggestions were followed they would possibly create a "state of the art" appellate division, but when questioned by your Commissioner he stated that *29 none of these proposed changes could be put into effect "Monday" in order to relieve the present crisis. Significantly, most of Mr. Reed's suggestions would cost the counties or the state more money; which is of course the problem in the first place. However, under no circumstances would implementation of Mr. Reed's suggestions remedy the current caseload problem in the Second District Court of Appeal. Even if all of his suggestions were implemented production would only be minimally increased. If all of his suggestions were implemented the backlog of 382 cases which are the subject of current motions would be hardly dented. The weight of Mr. Reed's testimony was substantially diminished by his lack of expertise in the particular area in question.

Recommendations
The appellate public defenders of the Tenth Circuit function under excessive caseloads and relief should be granted. The immediate issue to be resolved is how best to protect the constitutional rights of those appellants whose cases are backlogged to effective assistance of counsel on appeal. Records transmitted to the Public Defender in October and November of 1992 have already been assigned. Records transmitted in December 1992 and January 1993 should all be assigned for briefing by November 1993. To appoint private counsel in these cases could result in even further delay. Therefore, the recommendation to alleviate the pending backlog is as follows:
The Tenth Circuit Public Defender should continue to represent those appellants whose records were transmitted in December 1992 and January 1993. He should be allowed to withdraw from those cases in which the records were transmitted in February, March, April, and May 1993. He should continue to represent appellants whose records were transmitted in June, July, and August 1993. He should be permitted to withdraw from cases received in September, October, and November 1993.
Solutions to the problems of excessive caseload and chronic underfunding are not so simple. Every witness was invited to make suggestions as to steps which might help. Unfortunately, with the exception of additional funding, no one suggested that any of these steps would substantially impact the present caseload problem. Allowing the Public Defender to withdraw merely dramatizes the problem and is not a solution.
Some of the suggestions for a long-term resolution are as follows:
A. Increased funding for more lawyers, support staff, and computerization.
B. Adoption of a prospective withdrawal procedure similar to that used in the First District Court of Appeal to allow the Public Defender to withdraw early based on a recognition that the cases cannot be timely handled in the future.
C. Adoption of binding caseload/workload standards based upon the Florida Formula approach. These standards should be made a part of the Florida Rules of Judicial Administration or the Florida Criminal and Appellate Rules.

D. Increased pro bono representation by private counsel.
E. Appointment and funding of the study commission recommended by the Florida Supreme Court in In re: Order on Prosecution of Criminal Appeals, 561 So.2d at 1138 n. 7.
F. The Public Defender should constantly review the productivity of his office to insure that all improvements possible are being implemented to continue to increase the efficiency of his office in handling indigent criminal appeals.
 Respectfully submitted,
 /s/ J.C. CHEATWOOD
 Commissioner
NOTES
[1] We recognized in Skitka v. State, 579 So.2d 102, 104 (Fla. 1991), that courts should not grant withdrawal automatically when a public defender files a certificate reflecting a backlog. The public defender must present sufficient grounds to be allowed to withdraw. Id. In this case, the public defender demonstrated sufficient grounds in his two motions to withdraw from nearly 400 appeals because of conflict caused by an excessive caseload. The public defender pointed out the number of unassigned cases, the increase in caseload, the lack of staff and budget, and the fact that the Attorney General's office took no position on the motions.