12 So.3d 798 (2009)
The STATE of Florida and Office of Criminal Conflict and Civil Regional Counsel, Third District Court of Appeal Region, Appellants,
v.
PUBLIC DEFENDER, ELEVENTH JUDICIAL CIRCUIT, Appellee.
Nos. 3D08-2272, 3D08-2537.
District Court of Appeal of Florida, Third District.
May 13, 2009.
*799 Bill McCollum, Attorney General, and Scott D. Makar, Solicitor General, and Louis F. Hubener, Charles B. Upton, II, and Courtney Brewer, Deputy Solicitors General, Tallahassee, for appellant, The State of Florida; Joseph P. George, Jr., and Nancy C. Wear, for appellant, Office of Criminal Conflict and Civil Regional Counsel.
*800 Hogan & Hartson and Parker D. Thomson and Alvin F. Lindsay and Julie E. Nevins and Matthew R. Bray, Miami, for appellee, Public Defender, Eleventh Judicial Circuit.
Public Defender Association and James Marion Moorman, Public Defender Tenth Judicial Circuit, and Robert A. Young, General Counsel for the Florida Public Defender, Tenth Judicial Circuit, as amicus curiae.
Florida Prosecuting Attorneys Association and Arthur I. Jacobs, General Counsel for the Florida Prosecuting Attorneys Association, as amicus curiae.
Before SHEPHERD, CORTIAS, and SALTER, JJ.
PER CURIAM.
We review an order of the Circuit Court of the Eleventh Judicial Circuit permitting the Public Defender for Florida's Eleventh Judicial Circuit ("PD11") to decline representation in all future third-degree felony cases.

I. Background
In twenty-one criminal cases, PD11 filed motions seeking permission to be relieved of its statutory obligation to represent indigent defendants in noncapital felony cases. Each motion was accompanied by a certificate of conflict wherein PD11 claimed that underfunding led to excessive caseloads, which has prevented it from carrying out its legal and ethical obligations to indigent defendants. The twenty-one motions were consolidated and heard by the trial court. The State Attorney's Office ("the State") was denied standing to oppose PD11's motions, but was allowed to participate as amicus curiae.
After an evidentiary hearing, the trial court found that PD11's excessive caseload permitted only minimally competent representation and ordered that PD11 may decline all future representation of indigent defendants charged with third-degree felonies.[1] The trial court ordered the Office of Criminal Conflict and Civil Regional Counsel for the Third District ("Regional Counsel") to represent the affected indigent defendants.[2]
On appeal, the State[3] requested a stay of the trial court's order and PD11 suggested that the order be certified to our Supreme Court as either an issue of great public importance or as having a great effect on the proper administration of justice throughout the state. As this case implicates not only the manner in which the criminal justice system is structured and funded, but also constitutional separation of powers principles as well as the Sixth Amendment right to counsel in criminal cases, we granted the stay and certified the order to the Florida Supreme Court, which, in turn, dismissed for lack of jurisdiction. State v. Pub. Defender, Eleventh Judicial Circuit of Fla., 996 So.2d 213 (Fla.2008). We then set an expedited hearing schedule and invited amici curiae to submit briefs.

II. Standing
The trial court first addressed whether the State had standing to oppose *801 PD11's motion. We review de novo the issue of standing. Sanchez v. Century Everglades, LLC, 946 So.2d 563, 564 (Fla. 3d DCA 2006); Payne v. City of Miami, 927 So.2d 904, 906 (Fla. 3d DCA 2005). Generally, standing "requires a would-be litigant to demonstrate that he or she reasonably expects to be affected by the outcome of the proceedings, either directly or indirectly." Hayes v. Guardianship of Thompson, 952 So.2d 498, 505 (Fla.2006).
In ruling against the State's standing, the trial court relied on In re Order on Prosecution of Criminal Appeals by Tenth Judicial Circuit Public Defender, 561 So.2d 1130 (Fla.1990) ("In re Prosecution") and Escambia County v. Behr, 384 So.2d 147, 150 (Fla.1980). These cases address the unrelated issue of whether a county's financial stake in the withdrawal of an assistant public defender is sufficient to grant the county standing to oppose a motion to withdraw. In re Prosecution, 561 So.2d at 1138 ("[T]he county need not be given an opportunity to be heard before the appointment of counsel, even though it will be the responsibility of the county to compensate private counsel."). Under the former law, counties were required to fund the private attorneys, who were appointed by courts to replace assistant public defenders. Id. at 1137 ("The legislative history of ... Florida, makes it clear that the legislature never intended to relieve the counties of the obligation of paying for court-appointed attorneys in noncapital conflict cases."). The counties' obligation to fund replacement counsel has since shifted to the State of Florida. See Art. V, ß 14(c), Fla. Const.; Crist v. Fla. Ass'n of Criminal Defense Lawyers, Inc., 978 So.2d 134, 138 (Fla.2008).
Here, unlike Behr and In re Prosecution, the State sought standing as a party to each of the twenty-one criminal cases. The State, as a party to the criminal cases, is treated by statute differently than the counties. Section 27.02, Florida Statutes, provides in pertinent part, "[t]he state attorney shall appear in the circuit and county courts within his or her judicial circuit and prosecute or defend on behalf of the state all suits, applications, or motions, civil or criminal, in which the state is a party...." ß 27.02(1), Florida Statutes (2004). The State's status as a party to the criminal cases, as well as its statutory obligation under section 27.02, distinguishes this case from Behr and In re Prosecution. Therefore, we hold that the State had standing to challenge the motions filed by PD11.

III. Excessive by any Reasonable Standard
The trial court determined that PD11's caseload was excessive by any reasonable standard. Much of the evidentiary hearing was spent trying to ascertain the maximum number of cases a public defender should handle in a single year. The record indicates that there are a number of different ways to count such cases, and that they involve different workloads as some cases go on to an early plea, some are transferred when a private attorney is retained by the defendant, and others are ultimately assigned to drug court. Thus, even if the threshold for withdrawal could be defined as a certain number of open cases per attorneyÄîand we do not believe it can beÄîno such figure was proven in this record. Nevertheless, the order on review did not select a particular standard, and instead found that, under any reasonable standard, PD11's caseload was excessive.
We acknowledge the difficulty in selecting a single "correct" standard and do not believe that a magic number of cases exists where an attorney handling fewer than that number is automatically providing reasonably competent representation while *802 the representation of an attorney handling more than that number is necessarily incompetent. See In re Certification of Conflict in Mots. to Withdraw Filed by Pub. Defender of the Tenth Judicial Circuit, 636 So.2d 18, 21-22 (Fla.1994) ("In re Certification 1994") ("[W]e do not believe that courts are obligated to permit the withdrawal automatically upon the filing of a certificate by the public defender reflecting a backlog in the prosecution of appeals."). Moreover, even if such a number could be divined, it would certainly only have meaning when applied to an individual attorney and not an office as whole.

A. Aggregate Withdrawal
Determining conflicts of interest for an entire Public Defender's Office based on aggregate calculations is extremely difficult without first having considered individual requests for withdrawal in particular cases. See In re Prosecution, 561 So.2d at 1138 (concluding that when a backlog of cases is so excessive that assistant public defenders cannot possibly handle their assigned cases, it is the responsibility of the affected public defender to individually move the court to withdraw). The conclusion in the aggregate, that a conflict of interest exists, inherently lacks the meaningful individualized information required by such a determination.
While it is well within the province of a trial court to determine whether counsel is sufficiently competent, this determination must occur on a case-by-case basis. "If the public defender deems it necessary to be relieved from other appeals, he [or she] should file a motion to withdraw in this court promptly upon [appointment]. Such motions will be considered on a case-by-case basis...." Crow v. State, 500 So.2d 171, 172 (Fla. 1st DCA 1986); Haggins v. State, 498 So.2d 953, 954 (Fla. 2d DCA 1986) ("The circuit courts can better determine on a case-by-case basis the possible prejudice to the defendants resulting from any delays...."). We find this reasoning persuasive and equally applicable to motions to withdraw made at the trial level.
Although our Supreme Court has previously approved of an order prohibiting prospectively the appointment of assistant public defenders, that case is distinguishable because relief was granted only after individual assistant public defenders had first been removed from representation and a backlog of cases had caused the delayed filing of appeals for almost all defendants in the Public Defender's Office. In re Pub. Defender's Certification of Conflict & Mot. to Withdraw Due to Excessive Caseload & Mot. for Writ of Mandamus, 709 So.2d 101 (Fla.1998) ("In re Certification 1998"). Unlike In re Certification 1998, here, there has been no initial attempt at individualized withdrawal. Instead, PD11's first attempt at withdrawal was by way of a motion to withdraw en masse.
In re Certification 1998 is also distinguishable from the present case by the type of harm claimed. The In re Certification 1998 Court was attempting to stem the tide of delayed appeals. Id. at 103. In contrast, PD11 presented evidence of excessive caseload and no more. To be sure, whenever an attorney is burdened with an excessive caseload, there exists the possibility of inadequate representation.[4] The possibility of these harms was discussed at the hearing below. However, there was no showing that individual attorneys were providing inadequate representation, nor do we believe this could have *803 been proven in the aggregate, simply based on caseload averages and anecdotal testimony.[5]Brown v. State, 894 So.2d 137, 149 (Fla.2004) ("[T]he finding as to whether counsel was adequately prepared does not revolve solely around the amount of time counsel spends on the case ... and... is a case-by-case analysis.") (citing State v. Lewis, 838 So.2d 1102, 1113-14 n. 9 (Fla.2002)).

B. Rules Regulating The Florida Bar
PD11 posits that the only standard controlling whether assistant public defenders should withdraw is set forth in the Rules Regulating The Florida Bar ("RRFB"). R. Regulating Fla. Bar 4-1.1, 4-1.3, 4-1.4, 4-1.7, 4-1.16, and 4-3.2. The rules of professional conduct, however, are only meant to apply to attorneys, individually, and not the office of the Public Defender as a whole.
Several problems develop when an office of attorneys seeks to avoid future appointments on grounds that the office, on average, is already laboring under an excessive caseload. First, by viewing the claim of excessive caseload in the aggregate, a court fails to consider the particular skills and expertise of individual attorneys, thereby treating each attorney the same. Such analysis ignores the fact that varying education and experience enable each attorney to handle differing caseloads. Add to this, the disparity of time demanded depending on the type and complexity of a particular case, and an aggregate determination becomes even less meaningful. Second, an aggregate determination violates the spirit, if not also the express language, of the RRFB. See, e.g., R. Regulating Fla. Bar 4-1.7(a) ("a lawyer shall not represent a client if ....") (emphasis added); R. Regulating Fla. Bar 4-1.7(b)(1) ("the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation ....") (emphasis added); R. Regulating Fla. Bar 4-1.16 ("a lawyer shall not represent a client....") (emphasis added). Therefore, under the facts of this case, the determination of whether or not a conflict exists under the RRFB, must be made on an individual basis.

C. Section 27.5303, Florida Statutes (2007)
In 1990, the Florida Supreme Court determined that "[w]hen excessive caseload forces the public defender to choose between the rights of the various indigent criminal defendants he [or she] represents, a conflict of interest is inevitably created." In re Prosecution, 561 So.2d at 1135. In 2004, the legislature promulgated, and in 2007 amended, section 27.5303, which permits assistant public defenders to withdraw from representation based on a conflict of interest. ß 27.5303(1)(a), Fla. Stat. (2007).
If, at any time during the representation of two or more defendants, a public defender determines that the interest of those accused are so adverse or hostile that they cannot all be counseled by the public defender or his or her staff without a conflict of interest ... then the public defender shall file a motion to withdraw and move the court to appoint other counsel.
Id. The obligation to withdraw, however, is not without exception. "In no case shall the court approve a withdrawal by the public defender or criminal conflict and *804 civil regional counsel based solely upon inadequacy of funding or excess workload of the public defender or regional counsel." ß 27.5303(1)(d), Fla. Stat. (2007). Within section 27.5303, the Legislature provided guidance as to what constitutes a conflict of interest.
In determining whether or not there is a conflict of interest, the public defender or regional counsel shall apply the standards contained in the Uniform Standards for Use in Conflict of Interest Cases found in appendix C to the Final Report of the Article V Indigent Services Advisory Board dated January 6, 2004.
ß 27.5303(1)(e), Fla. Stat. (2007). The only conflicts addressed in appendix C are conflicts involving codefendants and certain kinds of witnesses or parties. Conspicuously absent are conflicts arising from underfunding, excessive caseload, or the prospective inability to adequately represent a client.
We must assume that when the Legislature drafted section 27.5303, it was aware of the prior state of the law. Williams v. Jones, 326 So.2d 425, 435 (Fla.1975) (noting the "principle of statutory construction which provides that the Legislature is presumed to know the existing law when it enacts a statute and is also presumed to be acquainted with the judicial construction of former laws on the subject concerning which a later statute is enacted") (citing Collins Inv. Co. v. Metro. Dade County, 164 So.2d 806 (Fla.1964)).
Thus, when the Legislature promulgated a law, which prohibited withdrawal based on excessive caseload and which stated that the "conflict of interest" contemplated by section 27.5303 included only the traditional conflicts arising from the representation of codefendants, we must assume that the Legislature understood the existing law and intended to modify it. Here, PD11 failed to submit to the trial court any evidence that a "conflict of interest," as described by section 27.5303(1)(e), existed.
The trial court did not reach the question of whether PD11 had presented evidence sufficient to prove a statutory conflict of interest, determining instead that section 27.5303(1)(d) did not apply because it addressed withdrawal from representation, rather than what PD11 sought, which was to have other counsel appointed in the first instance. We find this distinction unpersuasive for two reasons.
First, permitting PD11 to withdraw by merely couching its requests as motions to decline future appointments, would circumvent the plain language of section 27.5303(1)(d). We cannot allow such an exercise in semantics to undo the clear intent of the statute. Gannett Co. v. Anderson, 947 So.2d 1, 8 (Fla. 1st DCA 2006). If we did, section 27.5303(1)(d) would be rendered meaningless. Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 456 (Fla.1992) ("[C]ourts should avoid readings that would render part of a statute meaningless.").
Second, given that the trial court's order requires PD11 to accept appointments at first appearances and continue representation until arraignment, it is fanciful to suggest that the subsequent appointment of alternate counsel is anything other than a withdrawal.[6]
*805 That is not to say that an individual attorney cannot move for withdrawal when a client is, or will be, prejudiced or harmed by the attorney's ineffective representation. However, such a determination, absent individualized proof of prejudice or conflict other than excessive caseload, is defeated by the plain language of the statute. ß 27.5303(1)(a) and (d), Fla. Stat. (2007).

D. Funding
PD11's complaint that it receives inadequate funding is not novel. See, e.g., In re Certification 1998; In re Certification 1994; Hatten v. State, 561 So.2d 562 (Fla. 1990); In re Prosecution. Nor is our response.
[W]hile it is true that the legislature's failure to adequately fund the public defenders' offices is at the heart of this problem, and the legislature should live up to its responsibilities and appropriate an adequate amount for this purpose, it is not the function of this Court to decide what constitutes adequate funding and then order the legislature to appropriate such an amount. Appropriation of funds for the operation of government is a legislative function.
In re Prosecution, 561 So.2d at 1136 (citing Art. VII, ß 1(c), Fla. Const.).
Finally, we note that since 2005, PD11 has not filled at least sixteen full-time attorney positions that were funded by the legislature. For example, during the 2005-06 fiscal year, PD11 accepted $401,572, but did not fill seven full-time attorney positions. During the 2006-07 fiscal year, PD11 accepted $338,843, but did not fill six full-time attorney positions. During fiscal year 2007-08, PD11 accepted $138,602, but did not fill three full-time attorney positions. During the hearing, Public Defender Bennett H. Brummer acknowledged that he opted to increase employee salaries rather than hire additional staff. Similarly, statewide funding figures for the Public Defender Offices similarly reveal an increased funding of 14% from 2004-2008, while their full-time employees increased by only 2%.[7]
Although PD11's budget decreased during the past fiscal year,[8] the record does not demonstrate any correlation between the State budget reductions and a complete inability on the part of PD11 to handle any third-degree felony cases. For example, the act of withdrawing from representation in approximately 11,693 third-degree felony cases (the result of the ruling below), which constitutes 60% of the post-arraignment cases handled by PD11's 94 noncapital felony attorneys,[9] is entirely disproportionate to the amount of the budget reductions. There is simply insufficient evidence to support such a drastic remedy.

IV. Conclusion
We understand the difficulties faced by PD11. With an ever-increasing quantity of cases and a tight budget, their important *806 task is certainly made more difficult. The office-wide solution to the problem, however, lies with the legislature or the internal administration of PD11, not with the courts.
"We believe that within the existing statutory framework there exists a method for resolving the problem of excessive caseload." In re Prosecution, 561 So.2d at 1134. Only after an assistant public defender proves prejudice or conflict, separate from excessive caseload, may that attorney withdraw from a particular case. ß 27.5303(1)(a), Fla. Stat. (2007) ("The court shall deny the [assistant public defender's] motion to withdraw if the court finds the grounds for withdrawal are insufficient or the asserted conflict is not prejudicial to the indigent client.").
Reversed.
CORTIAS and SALTER, JJ., concur.
SHEPHERD, J., specially concurring.
I concur in the decision announced by the majority. Even setting aside the knotty, but judicially important and legally technical question concerning whether PD-11's twenty-one filed "Motion[s] to Appoint Other Counsel in Unappointed Noncapital Felony Cases," create a "case or controversy" under Florida law, see Dep't of Revenue v. Kuhnlein, 646 So.2d 717, 720 (Fla.1994) (noting "every case must involve a real controversy as to the issue or issues presented"),[10] this action is nothing more than a political question masquerading as a lawsuit, and should be dispatched on that basis.
Twelve years ago, in a case in which an assemblage of public school parents, students, and education providers sought to prosecute a complaint alleging the state was failing in its obligation to allocate adequate resources to the public school system as mandated by the people of the state in Article IX, section 1, of the Florida Constitution (1996),[11] our supreme court announced six criteria by which to gauge whether a case involves a political question, namely does there exist:
(1) a textually demonstrable commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3)[an] impossibility of deciding [the question] without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; and lastly (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Coal. for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles, 680 So.2d 400, 408 (Fla.1996) (citing Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Employing these criteria, the Court approved *807 the decision of the trial court that adjudication of the parents' and education providers' claims for relief was beyond its power. Coal., 680 So.2d at 408 ("[A]ppellants have failed to demonstrate in their allegations, or in their arguments on appeal, an appropriate standard for determining `adequacy' that would not present a substantial risk of judicial intrusion into the powers and responsibilities assigned to the legislature, both generally (in determining appropriations) and specifically (in providing by law for an adequate and uniform system of education).").
Applying these same criteria to the case at bar, our case likewise fails to present a justiciable issue. As in Coalition, the gravamen of PD-11's complaint in this case is inadequate funding. Id. As was the case in Coalition, there exists in the Florida Constitution a "textually demonstrable commitment" of the issue before us to a "coordinate political department," in this case the Florida legislature. Id.; see Art. VII, ß 1(c), Fla. Const. ("No money shall be drawn from the treasury except in pursuance of appropriation made by law."); Chiles v. Children A, B, C, D, E & F, 589 So.2d 260, 264 (Fla.1991) (holding the power to appropriate is legislative). It is not for us to intrude upon those powers. See Art. II, ß 3, Fla. Const. ("No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein."). Nor, as the majority well explains, is there any judicially discoverable and manageable standard to establish what is an "excessive caseload." As presented, this case cannot be adjudicated absent policy determinations of a kind clearly for nonjudicial discretion.
I empathize with PD-11's argument that its attorneys are overworked and under-resourced. Such appears to be the natural condition of the public servants who serve clients before the judicial branch of this state. Absent individual proof of constitutional injury to those clients, however, empathy or lack thereof is for the legislature.
On these premises, I join the judgment of the Court.
NOTES
[1] Originally, the trial court allowed PD11 to decline all "C" cases. Upon motion for clarification, the trial court explained that by "C" cases, it meant third-degree felony cases.
[2] Eight days after the trial court issued its order, Regional Counsel moved to intervene. The trial court denied its motion as untimely. Regional Counsel appealed that order, consolidated here as Case No. 3D08-2537. We affirm the trial court's denial of Regional Counsel's motion to intervene as it was filed eight days after the trial judge's order, which is the subject of this appeal.
[3] The State of Florida is represented by the Florida Attorney General's Office on appeal.
[4] We note, as the State did at the hearing below, that contrary to PD11's claim that its attorneys are providing inadequate representation, as recently as 2007, PD11 has received national recognition for its representation of indigent defendants.
[5] While the anecdotal claims of prejudice made by one assistant public defender who testified at the hearing below might be an important part of an individualized determination that a particular assistant public defender is providing inadequate representation, it falls far short of proving that each attorney at PD11 is providing inadequate representation.
[6] PD11 has created a system whereby one set of PD11 attorneys, the Early Representation Unit ("ERU"), represents defendants from first appearance until arraignment, at which time representation shifts to a different set of PD11 attorneys. The order under review leaves undisturbed this system. Where, in the normal course of events, the representation of a defendant passed at arraignment from an ERU attorney to another PD11 attorney, there was no withdrawal because representation remained at all times with PD11. Here, however, the transfer of representation to a non-PD11 attorney inevitably requires the PD11 attorney to withdraw.
[7] During the same time period, the State Court System and the Offices of the State Attorneys each received funding increases of 13%, which they used to increase the number of full-time employees by 4% and 5%, respectively.
[8] The budget for the entire PD11 office (excluding trust funds) actually increased from fiscal year 2004-05 through fiscal year 2007-08.
[9] According to a September 15, 2008 affidavit filed in this case, PD11 identified that it handled approximately 19,488 noncapital felony cases, of which 11,693 were third-degree felony cases.
[10] Remember, not a single client of PD-11 has objected to the representation being received by him or her on anything close to the grounds being urged by PD-11 to shift representation outside its offices. The parties to this proceedingÄîall governmental in natureÄî have had little to say about the procedural aspects of this case.
[11] At the time, Article IX, section 1 read:

Adequate provision shall be made by law for a uniform system of free public schools and for the establishment, maintenance and operation of institutions of higher learning and other public education programs that the needs of the people may require.
There have been several revisions and additions made to Article IX, section 1 since that time. Compare id. with Art. IX, ß 1, Fla. Const. (2003); Art. IX, ß 1, Fla. Const. (1999).