680 So.2d 400 (1996)
COALITION FOR ADEQUACY AND FAIRNESS IN SCHOOL FUNDING, INC., et al., Appellants,
v.
Lawton CHILES, Governor of the State of Florida and Presiding Officer of the State Board of Education; Douglas Jamerson, Commissioner of Education of the State of Florida; State Board of Education, a public Florida corporation; Pat Thomas, as President of the Florida Senate; and Bolley L. Johnson, as Speaker of the Florida House of Representatives, Appellees.
No. 85375.
Supreme Court of Florida.
June 27, 1996.
Rehearing Denied October 2, 1996.
*401 C. Graham Carothers and John T. Beranek of Macfarlane, Ausley, Ferguson & McMullen, Tallahassee; Claude H. Tison, Jr. and T. Terrell Sessums of Macfarlane, Ausley, Ferguson & McMullen, Tampa; Raymond Ehrlich of Holland & Knight, Jacksonville; A. Lamar Matthews, Jr. and Arthur S. Hardy of Matthews, Hutton & Eastmoore, Sarasota; and Frank P. Scruggs, II of Steel, Hector & Davis, Miami, for Appellants.
W. Dexter Douglass and Deborah K. Kearney, Executive Office of the Governor, Tallahassee, on behalf of Governor Lawton Chiles; D. Stephen Kahn, General Counsel, Tallahassee, on behalf of the Senate President; Robert A. Butterworth, Attorney General, and Joseph C. Mellichamp, III, Senior Assistant Attorney General, Tallahassee, on behalf of State Board of Education and Commissioner of Education; Michael H. Olenick, General Counsel, Florida Department of Education, Tallahassee, on behalf of Commissioner of Education; and Robert L. Shevin and Richard B. Simring of Stroock & Stroock & Lavan, Miami; Daniel C. Brown of Katz, Kutter, Haigler, Alderman, Marks, Bryant & Yon, P.A., Tallahassee; B. Elaine New, General Counsel and Gerald B. Curington, Deputy General Counsel, Tallahassee, on behalf of the Speaker of the Florida House of Representatives, for Appellees.
Mary M. Gundrum, Alice K. Nelson and Jodi Siegel of Southern Legal Counsel, Inc., Gainesville; Christina A. Zawisza and John M. Ratliff of the Children First, Legal Services of Greater Miami, Inc., Miami; Ann Piccard and Gale Pinkston, Bay Area Legal Services, Inc., Tampa; Deborah Weissman, Legal Services of North Carolina, Raleigh, NC; Lisa Carmona, Florida Rural Legal Services, Lake Worth; Wayne L. Thomas of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa; and Stefan Rosenzweig, Public Advocates, Inc., San Francisco, CA, for N.A.A.C.P., et al., Amici Curiae.
*402 PER CURIAM.
In a one-count complaint, appellants[1] sought declaratory relief against the appellees and asked the trial court to declare that an adequate education is a fundamental right under the Florida Constitution, and that the State has failed to provide its students that fundamental right by failing to allocate adequate resources for a uniform system of free public schools as provided for in the Florida Constitution. In support of their action, appellants alleged: (1) Certain students are not receiving adequate programs to permit them to gain proficiency in the English language; (2) Economically deprived students are not receiving adequate education for their greater educational needs; (3) Gifted, disabled, and mentally handicapped children are not receiving adequate special programs; (4) Students in property-poor counties are not receiving an adequate education; (5) Education capital outlay needs are not adequately provided for; and (6) School districts are unable to perform their constitutional duties because of the legislative imposition of noneducational and quasi-educational burdens.
The trial court dismissed the complaint with prejudice.[2] Upon appeal, all parties filed a joint suggestion that the First District certify this case to be one of great public importance requiring immediate resolution by this Court. The First District certified this case to this Court and we granted jurisdiction pursuant to the provisions of article V, section 3(b)(5) of the Florida Constitution. While not agreeing with all of the reasons advanced by the trial court, we affirm the order of dismissal.

PARTIES AND STANDING
Appellants assert that the trial court erred in ruling that they had not sufficiently alleged a jurisdictional basis for an action against the defendants in this suit. We agree. See Florida Dep't of Educ. v. Glasser, 622 So.2d 944, 948 (Fla.1993)(declaratory action relating to State's role in education should join "all persons who have an actual, present, adverse, and antagonistic interest in the subject matter"). With the exception of the Governor who, with the consent of appellants, did not file a response in the trial *403 court, all of the named appellees have either taken a present, adverse, and antagonistic position to that espoused by appellants or would be necessary parties to an action to determine the State's responsibility under the controlling constitutional provision. We agree that the Governor, both in his position as chief executive officer and as chairperson of the Board of Education, is an appropriate party because of the nature of the action.
We also agree that the Florida Senate and the Florida House of Representatives, acting through their respective presiding officers, are proper parties.[3] Indeed, both presiding officers have candidly conceded that they have been properly joined but have suggested that this Court might wish sua sponte to add the House and the Senate as formal parties. See also Fla. H.R. Rule 2.4 (1995)(authorizing the Speaker of the House to "initiate, defend, intervene in, or otherwise participate in any suit on behalf of the House"). The Senate has also participated in litigation before this Court through its designated representative where its interests were at stake, see, e.g., Florida Senate v. Graham, 412 So.2d 360 (Fla.1982), as has the House, see e.g., Florida House of Representatives v. Martinez, 555 So.2d 839 (Fla.1990); Dade County Classroom Teachers Ass'n v. Legislature, 269 So.2d 684, 685 (Fla.1972). We find no jurisdictional flaw in appellants' joining the House and Senate by including the presiding officers of those bodies in their respective capacities. Even if the House and Senate were required to be joined in some other manner, this would not be a basis for a dismissal with prejudice.
The trial court also questioned the standing of appellants to bring this action. This Court has held that "a citizen and taxpayer can challenge the constitutional validity of an exercise of the legislature's taxing and spending power without having to demonstrate a special injury." Chiles v. Children A, B, C, D, E & F, 589 So.2d 260, 262 n. 5 (Fla.1991). Furthermore, in Florida, unlike the federal system, the doctrine of standing has not been rigidly followed. Department of Revenue v. Kuhnlein, 646 So.2d 717, 720 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2608, 132 L.Ed.2d 853 (1995). Based on the allegations in this complaint, we conclude that all of the appellants have standing.[4]

DECLARATORY RELIEF
Appellants' request for declaratory judgment is fully consistent with several recent decisions of this Court. See, e.g., Chiles v. Children A, B, C, D, E, & F, 589 So.2d 260 (Fla.1991)(accepting jurisdiction over complaint for declaratory relief by children seeking to declare certain provisions of budgetary scheme unconstitutional); Martinez v. Scanlan, 582 So.2d 1167 (Fla.1991)(accepting jurisdiction in declaratory action to resolve dispute between various groups and Governor over validity of workers' compensation laws); Department of Revenue v. Kuhnlein, 646 *404 So.2d 717 (Fla.1994)(granting declaratory relief in action brought by residents alleging that rights under Commerce Clause were being infringed by illegal impact fee), cert. denied, ___ U.S. ___, 115 S.Ct. 2608, 132 L.Ed.2d 853 (1995).
As we recently explained in Santa Rosa County v. Administration Commission, Division of Administrative Hearings, "[t]he purpose of a declaratory judgment is to afford parties relief from insecurity and uncertainty with respect to rights, status, and other equitable or legal relations." 661 So.2d 1190, 1192 (Fla.1995). A party seeking declaratory relief must show:
[T]here is a bona fide, actual, present practical need for the declaration; that the declaration should deal with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts; that some immunity, power, privilege or right of the complaining party is dependent upon the facts or the law applicable to the facts; that there is some person or persons who have, or reasonably may have an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law; that the antagonistic and adverse interest[s] are all before the court by proper process or class representation and that the relief sought is not merely giving of legal advice by the courts or the answer to questions propounded from curiosity. These elements are necessary in order to maintain the status of the proceeding as being judicial in nature and therefore within the constitutional powers of the courts.

Id. at 1192-93 (quoting Martinez v. Scanlan, 582 So.2d at 1170).
Applying these legal principles to this case, we conclude that the instant case properly seeks declaratory relief.

OTHER JURISDICTIONS
Appellants urge us to examine cases from jurisdictions which have considered allegations of failure to ensure constitutional rights to adequate education and have defined adequacy in particular factual contexts. Appellants cite a number of cases where courts have rejected the notion that the judiciary lacks jurisdiction to perform any inquiry into state funding of education. Some have held that the state had failed to meet the constitutional requirements imposed by that state's constitution, while others have rejected such attacks.[5] While the views of other courts are *405 always helpful, we conclude that the dispute here must be resolved on the basis of Florida constitutional law and the relevant provisions of the Florida Constitution.

EDUCATION ARTICLE
This dispute turns on the meaning of the education article of the Florida Constitution and the respective roles of each branch of government in carrying out the mandate of that article. Article IX, section 1 of the Florida Constitution provides:

Adequate provision shall be made by law for a uniform system of free public schools and for the establishment, maintenance and operation of institutions of higher learning and other public education programs that the needs of the people may require.
(Emphasis added). We must analyze the plain meaning of the term "adequacy" by reviewing the historical evolution of Florida's education article. The constitutions of 1838, 1861, and 1865 all contained almost identical education articles.[6] It was not until 1868 that the legislature significantly expanded this constitutional provision. In 1868, the constitution was amended to provide in article VIII, sections 1 and 2:
It is the paramount duty of the State to make ample provision for the education of all the children residing within its borders, without distinction or preference.
The Legislature shall provide a uniform system of Common schools, and a University, and shall provide for the liberal maintenance of the same. Instruction in them shall be free.
(Emphasis added.) By this change, education became the "paramount duty of the State" and required the State to make "ample provision for the education of all the children."[7] In 1885, the phrase "paramount duty" was deleted from the education article. Subsequently, in 1968, the education article underwent another revision.
Still unanswered is the level of duty the present education clause places upon the *406 legislature to ensure a certain quality of education in Florida. As the trial court correctly noted, "[t]here is no textually demonstrable guidance in Article IX, section 1, by which the courts may decide, a priori, whether a given overall level of state funds is `adequate,' in the abstract." Although the term "adequate provision" has not been defined, several Florida cases have attempted to define the second phrase in this clause, "uniform system of free public education."
The earliest case to define "uniform system" under the education article of the 1885 constitution was State ex rel. Clark v. Henderson, 137 Fla. 666, 188 So. 351 (1939), where we said:
[A uniform system] ... means that a system of public free schools, as distinguished from the authorized State educational institutions, shall be established upon principles that are of uniform operation throughout the State and that such system shall be liberally maintained.
Id. 188 So. at 352. Subsequently, in School Board of Escambia County v. State, 353 So.2d 834 (Fla.1977), this Court defined "uniform system" as one where "the constituent parts, although unequal in number, operate subject to a common plan or serve a common purpose." Id. at 837. We also noted that nothing within this constitutional phrase required that all school districts have an equal number of board members or uniformity in physical plant or curriculum from county to county.
In St. Johns County v. Northeast Florida Builders Ass'n, 583 So.2d 635 (Fla.1991), this Court again reviewed the education article. In that case, a builders' association and a private developer brought a suit against St. Johns County claiming that an ordinance which imposed an impact fee on new residential construction for new school facilities violated the education article. In rejecting this claim, our opinion declared:
The Florida Constitution only requires that a system be provided that gives every student an equal chance to achieve basic educational goals prescribed by the legislature. The constitutional mandate is not that every school district in the state must receive equal funding nor that each educational program must be equivalent. Inherent inequities, such as varying revenues because of higher or lower property values or difference in millage assessments, will always favor or disfavor some districts.
Id. at 641. More recently, in Florida Department of Education v. Glasser, 622 So.2d 944 (Fla.1993), we declined to more specifically define "a uniform system of free public schools." In so doing, we reasoned that the legislature should be the one to initially give this phrase its meaning. Id. at 947. Justice Kogan's concurring opinion summarized the education uniformity clause under this framework:
The uniformity clause is not and never was intended to require that each school district be a mirror image of every other one. Such a goal is clearly impossible on a practical level, and the constitution should not be read to require an impossibility.
Moreover, Florida law now is clear that the uniformity clause will not be construed as tightly restrictive, but merely as establishing a larger framework in which a broad degree of variation is possible.
Id. at 950. As Justice Kogan's concurring opinion explained in Glasser, uniformity is a complicated question "involving the special expertise of the Legislature, its staff, its advisers on public finance, and the Department of Education." Id. at 951. Further, as these cases illustrate, each time the education article has been challenged, the challenging party made an objection to some specific funding issue. In contrast, in this case appellants have made a blanket assertion that the entire system is constitutionally inadequate.
We agree with the rationale expressed in the trial court's order, which stated:
While the courts are competent to decide whether or not the Legislature's distribution of state funds to complement local education expenditures results in the required "uniform system," the courts cannot decide whether the Legislature's appropriation of funds is adequate in the abstract, divorced from the required uniformity. To decide such an abstract question of "adequate" funding, the courts *407 would necessarily be required to subjectively evaluate the Legislature's value judgments as to the spending priorities to be assigned to the state's many needs, education being one among them. In short, the Court would have to usurp and oversee the appropriations power, either directly or indirectly, in order to grant the relief sought by Plaintiffs. While Plaintiffs assert that they do not ask the Court to compel the Legislature to appropriate any specific sum, but merely to declare that the present funding level is constitutionally inadequate, what they seek would nevertheless require the Court to pass upon those legislative value judgments which translate into appropriations decisions. And, if the Court were to declare present funding levels "inadequate," presumably the Plaintiffs would expect the Court to evaluate, and either affirm or set aside, future appropriations decisions, unless the Plaintiffs are seeking merely an advisory opinion from the Court. The Court cannot give an advisory opinion, May v. Holley, 59 So.2d 636 (Fla.1952). Accordingly, the Court declines to interpret Article IX, Section 1, of the Florida Constitution as Plaintiffs urge. That clause must be read in pari materia with the rest of the Constitution. The Court declines to read it in a manner which allows the judiciary to usurp the exercise of the appropriations power allocated exclusively to the Legislature under our Constitution. Because Plaintiffs do not ask the Court to review the constitutionality of any specific legislative enactment, the separation of powers provision of the Florida Constitution, Article II, Section 3, clearly prevents this court from granting the relief sought by Plaintiffs.

SEPARATION OF POWERS
Appellants, on the other hand, claim that they have not asked the court to usurp the legislative appropriation power but simply to declare that appellees' constitutional obligations have not been met. Although appellants recognize that the judiciary's broad grant of jurisdiction is subject to the separation of powers doctrine, they believe that the separation of powers doctrine is subject to an exception in the area of constitutionally guaranteed or protected rights. See Dade County Classroom Teachers Ass'n v. Legislature, 269 So.2d 684, 686 (Fla.1972). Appellants assert that they are simply asking the court to declare that adequate provision has not been made for the present system of free public education.
Appellees contend that the trial court correctly held that granting appellants relief would violate the separation of powers doctrine. Appellees maintain that what appellants want is for the trial court to order the appropriation of more money for education. This means that the judiciary would be intruding into the legislative power of appropriations. The trial court agreed with appellees and found that adjudicating appellants' claims was beyond its power because the claims presented a "non-justiciable political question."
Appellees further argue that we must consider this issue in the context that appropriations are textually and constitutionally committed to the legislature. Any judicial involvement would involve usurping the legislature's power to appropriate funds for education. The judiciary must defer to the wisdom of those who have carefully evaluated and studied the social, economic, and political ramifications of this complex issue the legislature. Ultimately, appellees suggest, it is up to the lawmakers and the citizens of this State to determine how much to appropriate for education.
We conclude that here, especially in view of our obligation to respect the separation of powers doctrine, an insufficient showing has been made to justify judicial intrusion. Article II, section 3 of the Florida Constitution expressly sets forth the separation of powers doctrine:
The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.
As this text demonstrates, each branch of government has certain delineated powers that the other branches of government may not intrude upon. For instance, the power to *408 appropriate state funds is expressly reserved to the legislative branch. More specifically, article VII, section 1(c) provides: "No money shall be drawn from the treasury except in pursuance of appropriation made by law." Thus, it is well settled that the power to appropriate state funds is assigned to the legislature. See Chiles v. Children A, B, C, D, E, and F, 589 So.2d 260, 264 (Fla.1991) (holding that power to appropriate is legislative).
In conjunction with their position on the separation of powers doctrine, appellees claim that appellants have raised a political question which is outside the scope of the judiciary's jurisdiction. The United States Supreme Court in Baker v. Carr, 369 U.S. 186, 209, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962), set forth six criteria to gauge whether a case involves a political question: (1) a textually demonstrable commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; and lastly (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Appellees claim that at least the first two of these criteria mandate affirmance here. Appellees suggest that the constitution has committed the determination of "adequacy" to the legislature, and that there is a "lack of judicially discoverable and manageable standards" to apply to the question of "adequacy." That is, appellees assert that there are no judicially manageable standards available to determine adequacy. In contrast, they note that the phrase "uniform" has manageable standards because by definition this word means a lack of substantial variation. By contrast, appellees contend, "adequacy" simply does not have such straightforward content.[8] We agree.
While we stop short of saying "never," appellants have failed to demonstrate in their allegations, or in their arguments on appeal, an appropriate standard for determining "adequacy" that would not present a substantial risk of judicial intrusion into the powers and responsibilities assigned to the legislature, both generally (in determining appropriations) and specifically (in providing by law for an adequate and uniform system of education).

CONCLUSION
We hold that the legislature has been vested with enormous discretion by the Florida Constitution to determine what provision to make for an adequate and uniform system of free public schools. Appellants have failed to demonstrate in their allegations a violation of the legislature's duties under the Florida Constitution.
For all of the foregoing reasons, we affirm the trial court's order of dismissal.
It is so ordered.
GRIMES, HARDING and WELLS, JJ., concur.
OVERTON, J., concurs with an opinion.
ANSTEAD, J., dissents in part with an opinion, in which KOGAN, C.J., and SHAW, J., concur.
OVERTON, Justice, concurring.
I concur with the majority that an insufficient showing has been made by the appellants to justify a judicial intrusion under the circumstances of this case.
I write to emphasize the importance of the education provision contained in article IX, section 1, of the Florida Constitution, and to explain that, in my view, our holding today does not mean that the judiciary should not be involved in the enforcement of this constitutional provision.
*409 This education provision was placed in our constitution in recognition of the fact that education is absolutely essential to a free society under our governmental structure. As the majority notes, provisions similar to the current education provision have been contained in our constitution since the early history of this state.
The authors of our United States Constitution and our general governmental structure have acknowledged the importance of education as well. As James Madison said:
Knowledge will forever govern ignorance; and a people who mean to be their own governours must arm themselves with the power that knowledge gives.... Learned institutions ought to be favorite objects with every free people. They throw that light over the public mind which is the best security against crafty and dangerous encroachments on the public liberty.
Robert S. Peck, The Constitution and American Values, in The Blessings of Liberty: Bicentennial Lectures At The National Archives 133 (Robert S. Peck & Ralph S. Pollock eds., 1989). Thomas Jefferson said it even more succinctly: "If a nation expects to be ignorant and free ... it expects what never was and never will be." Letter from Thomas Jefferson to Colonel Charles Yancey (Jan. 6, 1816). Further, in one of the most important cases ever decided by the United States Supreme Court, Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880 (1954), the Court stated that education is important "to our democratic society. It is required in the performance of our most basic public responsibilities.... It is the very foundation of good citizenship."
These quotes emphasize the need for education and knowledge in a democratic free society. There have been many examples in the world where, when tyrannical individuals or entities seize power, their first action is to eliminate, imprison, or exile the educated and take control of the educational process. Our forefathers intended that our state constitutions would protect our basic fundamental rights and that local governments would provide education for our citizens. Education has never been a responsibility of the federal government. The basic responsibility for education has always been with the states. The drafters of Florida's constitution recognized this fact and, accordingly, included the education provision to guarantee that a system of free public education be established for the citizens of Florida.
While I agree with Justice Kogan's view in Glasser that we should not give the constitution a stilted reading by requiring absolute uniformity among school districts, such a position does not preclude the treatment of education as an essential, fundamental right. In my view, this Court can recognize the basic need for the right to an adequate provision of educational opportunities without engaging in micro-management and without offending the separation-of-powers doctrine. There seems to be a belief that a fundamental right will be interpreted as guaranteeing a perfect or ideal education under this provision. Such a view ignores, however, the nature and purpose of our education provision. In my view, the intent of this provision, which mandates that adequate provision shall be made by law for a uniform system of free public schools, is to require the establishment of an educational system that fulfills the basic educational needs of the citizens of this state to provide for a literate, knowledgeable population. When a significant segment of our population is illiterate, our freedom can be easily threatened. I fully recognize that this provision does not ensure a perfect system. While "adequate" may be difficult to quantify, certainly a minimum threshold exists below which the funding provided by the legislature would be considered "inadequate." For example, were a complaint to assert that a county in this state has a thirty percent illiteracy rate, I would suggest that such a complaint has at least stated a cause of action under our education provision. To say otherwise would have the effect of eliminating the education provision from our constitution and relegating it to the position occupied by statutes. As noted, however, I agree with the majority that a proper showing of inadequacy has not been made in this case.
In conclusion, I emphasize that education is the key to unlocking the door to freedom *410 and keeping it open and that this constitutional provision was intended to do just that. Consequently, I believe that the right to an adequate education is a fundamental right for the citizens of Florida under our Florida Constitution.
ANSTEAD, Justice, dissenting in part.
I would reverse the dismissal of this action and remand for further proceedings so that a factual context can be established for determining whether the legislature has complied with the mandate of the people of Florida to make adequate provision for a uniform system of free public schools. By our action today, we have reduced to empty words a constitutional promise to provide an adequate educational system for our children.
By approving the dismissal of this case without any further factual inquiry, this Court has failed to carry out its duty to ensure that the legislature has performed its constitutional mandate to make "[a]dequate provision ... for a uniform system of free public schools." See Art. IX, § 1, Fla. Const. While the legislature may be vested with considerable leeway in carrying out this mandate, we cannot determine in a factual vacuum, without abrogating our own responsibility, that the mandate has been met. Indeed, the courts in other states have not hesitated to accept this fundamental and essential responsibility to give life and meaning to similar provisions in their state constitutions.[9] Justice Overton demonstrates this point in a very concrete way when he asserts that a claim of a thirty percent illiteracy rate in a county could demonstrate a constitutional violation.[10] Under the comprehensive allegations of inadequacies set out in appellants' complaint, it is entirely possible that they may be able to submit proof of such poor literacy rates if given the opportunity at an evidentiary hearing. Of course, low literacy rates constitute just one form of proof of an inadequate educational system.
Justice Overton has also made an eloquent case for the importance of education in our society. Indeed, that case stands unrebutted. In a society founded upon the principle of equal opportunity, education is the key. Surely all would agree that education is a fundamental value in our society. The question remains as to how we have recognized that value in Florida. The most obvious and effective way to recognize a value as fundamental and of the highest importance and priority is to make provision for that value in our society's supreme and basic charter, our constitution. We did that in Florida. The people of Florida recognized the fundamental value of education by making express provision for education in our constitution.
Of course, the people of Florida have gone much further than merely recognizing education as a fundamental value. They have mandated, in an express, direct way, that our legislature make adequate provision for an education system for our children, who are the obvious intended beneficiaries of the education article in the constitution. The legislature has been given no discretion or choice as to whether to act. Rather, the legislature has been "ordered" by the people to act, and the intent of the people is clear: to provide our children with an adequate system of education.
There are two other arguments advanced in support of the trial court's dismissal that *411 lack merit. First, I find it to be pure sophistry to suggest that by including a "uniformity" requirement within its terms, the education article is concerned only that whatever provision is made for education, the system be uniform. The major purpose of the education article is to provide for education, not to merely provide for uniformity. Hence, I reject the view that the education article contemplates an inadequate, but uniform, education system. Such a view does a great disservice to the citizens of this state who historically and repeatedly have insisted that provision for education be made in the constitution.
Second, I also reject the view that our education article allows any lesser system of education because it uses the word "adequate" as opposed to some superlative like "terrific" or "first class," etc. It would be redundant, and totally unnecessary, having directed that adequate provision be made for a system to educate our children, to add "puffing" words to suggest the quality of the system contemplated. "Adequate" does the job. It also would be insulting to prior generations of Floridians to suggest that, by utilizing the word "adequate" in the education article, they intended a lower quality system of education. What is obvious is that Floridians have recognized the value of education for well over a hundred years and have "put their money where their mouths are" by providing for education in the state constitution.
Further proceedings below may ultimately end in the same result as the dismissal here. Indeed, based upon a sufficient factual predicate, it may well be determined that the Florida legislature has made adequate provision for the education of Florida's children. But those who had the wisdom to provide for education in our constitution are at least entitled to know that we took them at their word and held the legislature accountable for the responsibility and trust placed in it to provide for Florida's children.
KOGAN, C.J., and SHAW, J., concur.
NOTES
[1] The appellants in this action included: 11 Florida public school students and their parents and guardians: Mary Heather Alderman, Roy Alderman, Mary Alderman, Clayton Archey, Hope Archey, Judy Archey, Steven Aranaga, Cheryl Aranaga, Cassie Black, Jerry Black, Kimberly Christensen, Lee Christensen, Gwen Christensen, Chancellor Donald, Nettie Donald, Ashley Fils-Aime, Daniel Fils-Aime, Eugenie Fils-Aime, Jason Garcia, Annie Garcia, Travis Hunter, Glenn Hunter, Kimberly Register, and Paula Register; 23 citizens and taxpayers of the State of Florida who are also members of various school boards in this state: Samuel S. Agner, Jr., Glenn Barrington, Brenda H. Carlton, Dwight Crews, Ruthann Derrico, James R. Edwards, Glenn Hunter, Carol Kurdell, Frank J. Lagotic, William L. Marine, Jr., Yvonne T. McKitrick, Janice K. Mee, Joe E. Newsome, Peter Pollard, Sam Rampello, Doris Ross Reddick, Marion S. Rodgers, Linda Sutherland, James H. Townsend, Paula Veible, Odis D. Whiddon, Andrea Whiteley, and Donald V. Wiggins; and 45 Florida school boards from the following counties: Alachua, Baker, Bay, Bradford, Brevard, Calhoun, Charlotte, Citrus, Clay, Columbia, Dixie, Escambia, Flagler, Franklin, Gadsden, Gulf, Hamilton, Hardee, Hernando, Highlands, Hillsborough, Indian River, Jackson, Jefferson, Lafayette, Lee, Leon, Liberty, Madison, Manatee, Marion, Nassau, Orange, Osceola, Pasco, Polk, Putnam, St. Johns, Santa Rosa, Sarasota, Sumter, Taylor, Volusia, Wakulla, and Washington.
[2] In denying appellants relief, the trial court made the following findings: (1) To grant relief, the trial court would have to usurp or intrude upon the appropriation power exclusively reserved to the legislature; (2) The instant claim presents a non-justiciable political question; (3) Adequate provision as expressed under article IX, section 1, of the Florida Constitution cannot refer to "adequate" funding; (4) The alleged facts do not show a substantial inequality of education funding among school districts; (5) The appellant coalition and the school boards are not "persons" protected under article I, section 9 of the Florida Constitution; (6) The school children have not shown that the funding formula is not rationally related either to the charge of providing a uniform system of free public education or to the general health, safety, and welfare of Florida citizens; (7) Florida's Constitution does not create a fundamental right to a particular level of funding; (8) There are no allegations which indicate discrimination of a suspect class which would justify reviewing the legislature's education policy under a strict scrutiny test; (9) Appellants have failed to state a claim under article IX, section 6 of the Florida Constitution; (10) Appellants have failed to state a claim under article X, section 15 of the Florida Constitution; (11) Appellants have failed to state a claim against the Speaker of the House and President of the Senate.
[3] Although the complaint names Pat Thomas, as President of the Florida Senate, and Bolley L. Johnson, as Speaker of the House of Representatives, the current President of the Senate is James A. Scott and the current Speaker of the House is Peter R. Wallace.
[4] The trial court found that neither the school boards nor the coalition are "`natural persons' within the meaning of [article 1, section 2 of the Florida Constitution] .... [and][w]hile the plaintiff school children and parents of school children are natural persons, they allege no facts showing that they have been deprived of any right guaranteed them by law because of race, religion or physical handicap; nor any facts showing that they are in a class treated differently from other classes without rational relationship to legitimate state goals."

There is no question that this case involves a controversy that would have a direct impact on Florida children. The eleven public school students have alleged that they are suffering a continuing injury as a result of being denied an adequate education. We also recognize their parents' standing as natural parents and guardians of the students.
The school boards claim standing to challenge a constitutional violation which renders them unable to adequately discharge their duties. In Reid v. Kirk we said, "standing is allowed when a public official is willing to perform his duties, but is prevented from doing so by others." 257 So.2d 3, 4 (Fla.1972). Because the school boards are allegedly prevented from carrying out their statutory duties, we agree that they have standing to litigate this matter. While we question the standing of the coalition, we need not discuss that issue because of the standing of the other plaintiffs.
[5] For example, in Washakie County School District v. Herschler, 606 P.2d 310, 314 (Wyo.), cert. denied, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980), the school districts, school board members, and students brought an action seeking declaratory judgment that the state system of financing public education was unconstitutional because state funding was conditioned upon the wealth of the taxpaying ability of the local school district. Id. at 321. Since this system created a wealth-based classification, the court reviewed the matter under a strict-scrutiny standard. Id. at 333. After applying the strict-scrutiny test, the court held that the Wyoming system of funding education failed to meet this standard. Id. Thus, the Washakie court found the state educational funding system unconstitutional because it violated that state's equal protection provision. Id. at 334.

On the other hand, the Supreme Court of Kentucky found the state's school system unconstitutional, not on equal protection grounds, but because it violated Kentucky's constitutional requirement for an efficient system of common schools. Rose v. Council for Better Educ., 790 S.W.2d 186, 212 (Ky.1989). In finding that the Kentucky school system fell short of the constitutionally mandated standard of an "efficient" school system, the court looked at evidence which revealed that Kentucky's school system was underfunded, inadequate, and fraught with inequalities and inequities. Id. at 196. Likewise, the Alabama Supreme Court found that Alabama's system of elementary and secondary education was unconstitutional because it violated both the equal protection clause and the education article of Alabama's constitution. Opinion of the Justices, 624 So.2d 107, 110 (Ala. 1993).
In several other jurisdictions, courts have reversed dismissals and remanded for lower courts to determine whether the states' educational systems were constitutional. For example, in Idaho the supreme court reversed a dismissal in a lower court because the plaintiffs (citizens/taxpayers, school districts, superintendents, and superintendents' association) had "stated a valid cause of action in alleging that the current funding system did not provide a thorough education." Idaho Schools for Equal Educ. Opportunity v. Evans, 123 Idaho 573, 850 P.2d 724, 734 (1993); see also Claremont School Dist. v. Governor, 138 N.H. 183, 635 A.2d 1375 (1993); Pauley v. Kelly, 162 W.Va. 672, 255 S.E.2d 859 (1979).
In contrast, in Ohio, the court upheld the constitutionality of its school system. Board of Educ. v. Walter, 58 Ohio St.2d 368, 390 N.E.2d 813 (1979), cert. denied, 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980). In so doing, the Supreme Court of Ohio found that the rational basis standard applied because "the case is more directly connected with the way in which Ohio has decided to collect and spend state and local taxes than it is a challenge to the way in which Ohio educates its children." Id. 390 N.E.2d at 818. The Court found that local control was a rational basis that supported Ohio's school financing system, and the system therefore withstood the challenge and was declared constitutional. Id. 390 N.E.2d at 819. Similarly, North Carolina courts have rejected attacks on its school system under the education article of the North Carolina constitution. Leandro v. North Carolina Bd. of Educ., 122 N.C.App. 1, 468 S.E.2d 543 (1996).
[6] In its entirety the education article of the 1838 constitution stated:

1. The proceeds of all lands that have been, or may hereafter be, granted by the United States for the use of schools, and a seminary or seminaries of learning, shall be and remain a perpetual fund, the interest of which, together with all moneys derived from any other source applicable to the same object, shall be inviolably appropriated to the use of schools and seminaries of learning respectively, and to no other purpose.
2. The general assembly shall take such measures as may be necessary to preserve from waste or damage all land so granted and appropriated to the purpose of education.
Art. X, Fla. Const. (1838). The education provisions of the 1861 and 1865 constitutions were substantially the same. Art. X, Fla. Const. (1865); Art. X, Fla. Const. (1861).
[7] In order to understand the significance of this change, we must first determine the level of duty imposed on the legislative branch by the use of these words. Several scholars, who have analyzed state education clauses, have developed a four-category system. By using this category system, they attempt to measure the level of duty imposed on the state legislature. For instance, a Category I clause merely requires that a system of "free public schools" be provided. A Category II clause imposes some minimum standard of quality that the State must provide. A Category III clause requires "stronger and more specific education mandate[s] and purpose preambles." And, a Category IV clause imposes a maximum duty on the State to provide for education. Barbara J. Staros, School Finance Litigation in Florida: A Historical Analysis, 23 Stetson L.Rev. 497, 498-99 (1994). Using this rating system, Florida's education clause in 1868 imposed a Category IV duty on the legislaturea maximum duty on the State to provide for education. In addition, it also imposed a duty on the legislature to provide for a uniform system of education. Under the same system, Florida's present educational clause would be a Category II. That is, in Florida, the legislature is required to provide some minimum level of quality in education. Id. at 498.
[8] The dictionary defines adequate as "enough or good enough for what is required or needed; sufficient; suitable." Webster's New World Dictionary 16 (2d ed.1978).
[9] See, e.g., Alabama Coalition for Equity, Inc. v. Hunt, Nos. CV-90-883-R, CV-91-0117 (Ala.Cir. Ct., Montg.Cty., 1993), included as appendix to Opinion of the Justices, 624 So.2d 107 (Ala. 1993); Roosevelt Elementary Sch. Dist. No. 66 v. Bishop, 179 Ariz. 233, 877 P.2d 806 (1994); Rose v. Council for Better Educ., Inc., 790 S.W.2d 186 (Ky.1989); McDuffy v. Secretary of Exec. Office of Educ., 415 Mass. 545, 615 N.E.2d 516 (1993); Helena Elementary Sch. Dist. No. 1 v. State, 236 Mont. 44, 769 P.2d 684 (1989), opinion amended by, 236 Mont. 44, 784 P.2d 412 (1990); Robinson v. Cahill, 62 N.J. 473, 303 A.2d 273 (1973); Bismarck Pub. Sch. Dist. No. 1 v. State, 511 N.W.2d 247 (N.D.1994); City of Pawtucket v. Sundlun, 662 A.2d 40 (R.I.1995); Tennessee Small Sch. Sys. v. McWherter, 851 S.W.2d 139 (Tenn.1993); Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. School, 826 S.W.2d 489 (Tex.1992); Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71 (1978); Washakie County Sch. Dist. No. 1 v. Herschler, 606 P.2d 310 (Wyo.), cert. denied, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980).
[10] The appellants, of course, have the option of filing another action if they can allege and demonstrate inadequacies sufficient to meet the requirements set out in the various opinions of the judges of this Court filed in this case.