ROBERTS, J.,
dissenting.
In Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles, 680 So.2d 400, 402 (Fla.1996), the plaintiffs filed a complaint seeking declaratory relief challenging the funding of the state school system of K-12 education. They alleged that the funding and policies adopted by the legislature did not meet the requirements of article IX, section 1 of the Florida Constitution. They asked the trial court to declare that an adequate education was a fundamental right under the Constitution and that the state had failed to make adequate provision for a uniform system of free public schools as provided for in the Constitution. The trial court dismissed the complaint with prejudice finding that, to grant relief, it would have to usurp or intrude upon the appropriation power exclusively reserved to the legislature. The trial court also found that the complaint presented a non-justiciable political question. Id.
On appeal, the Florida Supreme Court affirmed the trial court’s dismissal. Id. at 402, 408. The court first examined the text of article IX, section 1 of the Constitution, which provided:
Adequate provision shall be made by law for a uniform system of free public *476 schools and for the establishment, maintenance and operation of institutions of higher learning and other public education programs that the needs of the people may require.
Id. at 405 (emphasis supplied). To determine whether the case involved a non-justiciable political question, the court adopted the test from Baker v. Carr, 369 U.S. 186, 209, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), which set forth the following six criteria:
(1) a textually demonstrable commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; and lastly (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Coalition, 680 So.2d at 408. The court focused on the second criterion, specifically whether the command of the Constitution for “adequate provision” for schools provided judicially discoverable and manageable standards that could be used to decide the case. Id.
The court agreed with the trial court’s statement that there was no textually demonstrable guidance in article IX, section 1, from which the courts could decide in the abstract whether a certain level of state funds was adequate. Id. at 406. The court further agreed with the trial court’s statement:
To decide such an abstract question of “adequate” funding, the courts would necessarily be required to subjectively evaluate the Legislature’s value judgments as to the spending priorities to be assigned to the state’s many needs, education being one among them. In short, the Court would have to usurp and oversee the appropriations power, either directly or indirectly, in order to grant the relief sought by Plaintiffs.
Id. at 406-07.
In the instant case, the respondents filed a declaratory judgment action alleging that the state appropriations act and the statutes relating to K-12 education are unconstitutional.[9] In support of their action, the respondents allege: (1) the statutes do not provide enough money in the aggregate to the public school system; (2) the statutes do not allocate the money appropriately across the state; (3) the statutes do not adequately identify pressing needs in the system or make adequate provision therefore; (4) the per-pupil expenditure by the state has decreased in recent years; (5) the state education budget has eliminated funding for seventh period and summer school; (6) the statutes have allowed too many students for each writing teacher; (7) teacher salaries are too low, and teachers are under qualified; (8) the FCAT results in a lower quality education; (9) schools are not “safe and secure” because the number of students reporting being threatened at school and the number of reported fights at school are above the national average; (10) graduation rates are inadequate; (11) grade promotion and retention are inadequate; and (12) insufficient resources are allotted to *477 special education. These allegations are the same type of allegations that were before the court in Coalition. The respondents believe, as did the appellants in Coalition, that many of the programs in the school system were not adequately funded, could be administered differently, or both.
In 1998, article IX, section 1 was amended to provide:
The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education[.]
As such, we must examine whether the amendment cures the defect identified in Coalition. In other words, we must decide whether the amendment provides standards by which the judiciary can measure the statutes challenged to determine whether they are constitutional.
In Coalition, the court held that the term “adequate provision” did not provide any guidance in determining whether the school system met constitutional requirements. The amendment emphasizes the importance of education in the state by declaring it to be “a fundamental value” and makes it “a paramount duty” to make “adequate provision” for the education of students. The term “adequate provision” was amplified to mean “a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education.”
The respondents challenge whether our state’s school system of K-12 education is efficient, safe, secure, and high quality. Certainly, the purpose of the amendment was to send a signal to the policymakers of Florida stressing the importance of education. However, even though the additional language clearly expresses an emphasis on education, it does not provide any more of a justiciable standard than the “adequate provision” command did in Coalition. The terms “efficient, safe, secure, and high quality” do not lend themselves to a “yes or no” evaluation. The terms are adjectives of degree, meaning that even an unlimited amount of resources and ideal policies and administration could not provide a guarantee of perfect efficiency, safety, security or quality. The Constitution does not provide guidance to courts in determining how efficient, safe, secure or high quality the school system is required to be.[10] Rather, the terms require a policy judgment regarding whether the system is efficient, safe, secure or high quality. Whether the legislature has created a system that meets the requirements expected by our citizens will have to be judged by the citizens themselves. For a court to attempt to determine whether the school system is efficient, safe, secure or high quality would require the court to substitute its own judgment for the policy decisions made by the other branches of the government.
Indeed, the respondents acknowledge in their response to the petitioners’ motion to dismiss that the trial court will be “required to listen to experts, make findings of fact and draw legal conclusions” in its effort to fashion a standard. The 160 *478 elected representatives of the people have enacted statutes attempting to implement all of the constitutional commands regarding education in Chapters 1000-1013, Florida Statutes (2011), comprising 490 pages of the statutes. Additionally, the state has provided in excess of $12 billion for PK-12 education in this budget year, exclusive of Public Education Capital Outlay funds. Both the statutes and the appropriations act involved the input of experts, teachers, school district officials, state education officials, parents, and other interested citizens numbering in the thousands. The legislative and executive branches were required to make policy judgments to implement the Constitution within the resources available. The respondents would have the courts first create a standard by which to determine whether the schools are efficient, safe, secure, and high quality, and then substitute the policy judgments of the judicial branch for those of the legislative and executive branches.
The majority cites to Bush v. Holmes, 919 So.2d 392 (Fla.2006), for the proposition that, when drafting the 1998 amendment, the Constitutional Revision Commission intended to provide enforceable standards and correct the deficiency of Coalition. However, in Holmes, the court recognized that the Commission originally considered using the term “fundamental right,” but chose the term “fundamental value” instead to avoid state liability for citizens’ dissatisfaction with the school system. 919 So.2d at 403-04. Whether the Commission intended to create a justi-ciable standard is ultimately irrelevant. The test is whether an enforceable standard was actually created by the text of the amendment itself. Because the terms “efficient, safe, secure, and high quality” are no more susceptible to judicial enforcement than the term “adequate,” this claim cannot be enforced by the courts. Regarding the legal basis for granting the writ, it is simple: the trial court’s order denying the petitioners’ motion to dismiss violates the separation of powers because it violates the people’s fundamental right to enact education policies through their elected representatives. Florida law requires a strict separation of powers, as mandated under article II, section 3 of the Constitution. See Fla. House of Representatives v. Crist, 999 So.2d 601, 611 (Fla.2008) (“In construing our constitution, we have ‘traditionally applied a strict separation of powers doctrine.’ ”). Thus, the instant case should be barred in prohibition to prevent a costly violation of article II, section 3.
We need look no further than the respondents’ own claims to find that this case impermissibly intrudes on the legislative branch's powers. For example, in their amended complaint, they allege that the legislature has failed to provide sufficient funding for education. Their prayer for relief requests that the trial court order the petitioners to establish a remedial plan that conforms with the Constitution by providing a high quality school system that allows students to obtain a high quality education, and requires studies to determine the resources and standards necessary to do so. In other words, the respondents seek a declaratory judgment that would somehow define the standards that are missing in article IX, section 1, and set minimum appropriation levels. This is made clear in that the respondents also demand that that the trial court retain jurisdiction to enforce its order and grant any other relief it deems proper. Courts, however, cannot appropriate funds. See Art. II, § 3, Fla. Const. (“No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.”); Art. V, § 14(d), Fla. Const. (“The judiciary *479 shall have no power to fix appropriations.”); Art. VII, § 1(c), Fla. Const. (“No money shall be drawn from the treasury except in pursuance of appropriation made by law.”).
Further, the respondents seek a declaration that would mandate a change in educational policy consistent with their policy views. In their amended complaint, they allege that the state’s current accountability policy is an obstacle to obtaining a high quality education. Education policy matters such as the state’s accountability policies involve thousands of interested persons, including parents, teachers, administrators, and locally elected officials. As in matters of appropriations, under our constitution’s strict separation of powers, only the legislature is properly equipped to balance the competing interests involved in education debates, in addition to other vitally important issues such as criminal justice, health care, economic and environmental regulation, and other matters. Thus, it is solely in the legislative branch that the constitutional values of an “efficient, safe, secure and high quality” school system can be constitutionally defined and implemented.
In other words, this question is quintessentially political and thus not justiciable, and the writ of prohibition must issue as the trial court did not have jurisdiction to consider this question. See generally, The Fla. Senate v. Fla. Public Employees Council 79, 784 So.2d 404 (Fla.2001). In Florida Senate, the court recognized that the judiciary has no power to encroach on the legislative process and stated that it is the “final product” of legislation that is subject to judicial review. Id. at 408. Here, however, the respondents seek a declaratory judgment to order the legislature to make policy and appropriation changes in futuro. Thus, while the respondents purport to challenge present appropriations and policies, their prayer for relief seeks to order the legislature to enact policies and increase appropriations, and such relief cannot be granted without interfering in internal legislative affairs, by necessity.
Nor are the respondents’ allegations challenging present legislative action enough to immunize improper judicial review from the reach of the writ of prohibition. In State v. Bloom, 497 So.2d 2 (Fla.1986), the court held that prohibition would lie where a trial court attempted to issue a pre-trial order depriving the elected state attorney from seeking the death penalty. There, the court stated, “If we allowed the circuit judge to make pre-trial determinations of the death penalty’s applicability, we would be modifying the death penalty’s statutory scheme.” Id. at 8. Here, the trial court’s order would allow it to conduct a trial of Florida’s educational policies and thus act as a legislative body by “modifying” educational policies in direct contravention of article II, section 3.
We can look to several decisions from other states which highlight why this is a non-justiciable case and the dangers of allowing such litigation to consume years and millions of public dollars in a quixotic attempt to somehow craft a judicial remedy for a political challenge. In Marrero v. Commonwealth, 559 Pa. 14, 739 A.2d 110, 111 (1999), the Pennsylvania Supreme Court addressed a state constitutional article that requires the General Assembly to “provide for the maintenance and support of a thorough and efficient system of public education.” The plaintiffs sued, claiming that the assembly violated the provision, and presented very similar arguments to the respondents’ arguments in the instant case. The trial court dismissed the complaint, finding that it presented a non-justiciable question directed solely to the legislative branch, and judi *480 cial review would therefore violate the separation of powers. Id.
On appeal, the court affirmed the trial court’s dismissal, holding that the trial court properly ruled that the state constitution did not confer an individual right to a particular level of education, but, instead, imposed a constitutional duty on the legislative branch. Id. at 112. The court noted that the state constitution made it impossible for a court to bind future legislatures “to a present judicial view” of appropriate educational services. Id. The same logic applies in the instant case as the terms “safe, secure, and high quality” are no more quantifiable than the terms “thorough” and “efficient.”
The Marrero court further recognized that “[a]s long as the legislative scheme for financing public education ‘has a reasonable relation’ to ‘[providing] for the maintenance and support of a thorough and efficient system of public schools,’ the General Assembly has fulfilled its constitutional duty to the public school students[.]” Id. at 113 (alteration in original) (citations omitted). As did the trial court, the court declined to “inquire into the reason, wisdom, or expediency of the legislative policy with regard to education, nor any matters relating to legislative determinations of school policy or the scope of educational activity.” Id.
The Marrero court’s recognition that a legislative scheme’s “reasonable relation” to a constitutional mandate fulfills a legislature’s duty without allowing judicial review rebuts the argument that prohibition cannot lie in the instant case because somehow a litigant or a judge can hypothesize some patently irrational legislative scheme. Prohibition is not defeated because of such a hypothetical, where a mul-ti-billion dollar school system exists based on a complex statutory formula. Clearly, in Florida, there is no credible claim that the legislature has patently abandoned its duty to provide a reasonable education; rather, the respondents’ assertion is that somehow the system is not “efficient, secure, and high quality.” But such assertions can only be addressed to lawmakers, not judges.
This reality was recognized by the Rhode Island Supreme Court in City of Pawtucket v. Sundlun, 662 A.2d 40 (R.I.1995). In Sundlun, the court stated
Faced with this absence of standards, the trial justice adopted one: the right to receive an “equal, adequate, and meaningful education,” a standard that is not susceptible of judicial management. What constitutes an appropriate education or even an “equal, adequate, and meaningful” one, “is not likely to be divined for all time even by the scholars who now so earnestly debate the issues.” Because we believe the proper forum for this deliberation is the General Assembly, not the courtroom, we decline to endorse the trial justice’s plan[.]
Id. at 58 (citation omitted). According to the court, the trial court’s plan required the people of Rhode Island
“to turn over to a tribunal against which they have little if any recourse, a matter of such grave concern to them and upon which they hold so many strong, though conflicting views. If their legislators pass laws with which they disagree or refuse to act when the people think they should, they can make their dissatisfaction known at the polls.... The court, however, is not so easy to reach ... nor is it so easy to persuade that its judgment ought to be revised.”
Id. (quoting Seattle Sch. Dist. No. 1 of King County v. State, 90 Wash.2d 476, 585 P.2d 71, 120 (1978) (Rosellini, J., dissenting)). The court pointed out one additional caveat: “the absence of justiciable standards could engage the court in a morass *481 comparable to the decades-long struggle of the Supreme Court of New Jersey that has attempted to define what constitutes the ‘thorough and efficient’ education specified in that state’s constitution.” Id. at 59.
This judicial respect for the separation of powers and the refusal to hear eases which would embroil the courts in a policy morass and isolate the public was also acknowledged by the Illinois Supreme Court in Committee for Educational Rights v. Edgar, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178 (1996). There, the court explained:
To hold that the question of educational quality is subject to judicial determination would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals in Illinois. Judicial determination of the type of education children should receive and how it can best be provided would depend on the opinions of whatever expert witnesses the litigants might call to testify and whatever other evidence they might choose to present. Members of the general public, however, would be obliged to listen in respectful silence.
Id. at 1191. The court held:
We conclude that the question of whether the educational institutions and services in Illinois are “high quality” is outside the sphere of the judicial function. To the extent plaintiffs’ claim that the system for financing public schools is unconstitutional rests on perceived deficiencies in the quality of education in public schools, the claim was properly dismissed. For the foregoing reasons, we affirm the dismissal of plaintiffs’ claims under the education article of our state constitution.
Id. at 1198. In Lewis E. v. Spagnolo, 186 Ill.2d 198, 238 Ill.Dec. 1, 710 N.E.2d 798, 800 (1999), the court reaffirmed its holding in Edgar that questions relating to the quality of a public school education are for the legislature to decide, not the courts. We must do the same here and grant the writ of prohibition to prevent the trial court from acting without subject-matter jurisdiction.
Accordingly, I believe we should grant the petition. Failing that, I agree with the certified question.
ORDER ON REHEARING
Petitioners’ motion for rehearing and clarification filed December 7, 2011, is denied. BENTON, C.J., WOLF, LEWIS, ROBERTS, WETHERELL, ROWE, MARSTILLER, RAY, and SWANSON, JJ., CONCUR. PADOVANO, J„ CONCURS in an opinion joined by DAVIS, VAN NORTWICK and CLARK, JJ.

. Rather than allege that a particular statute is unconstitutional, the respondents allege that the entire statutory array regarding K-12 education, Chapters 100-1013, Florida Statutes, fall short of the constitutional mandate.

. The requirement in article IX, section 1(a) at issue can be contrasted with the language in article IX, section 1(a)(1), known as the class size amendment. The class size amendment provides detailed definitions and quantifiable measures. If the drafters of the 1998 amendment to article IX had intended to create judicially manageable standards, it would not have been difficult to do so.