IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

CITIZENS FOR STRONG
SCHOOLS, INC., FUND
EDUCATION NOW, INC.,
EUNICE BARNUM, JANIYAH
WILLIAMS, JACQUE
WILLIAMS, SHEILA
ANDREWS, ROSE NOGUERAS,
and ALFREDO NOGUERAS,

        Appellants,

v.

FLORIDA STATE BOARD OF
EDUCATION; ANDY
GARDINER, in his official
capacity as the Florida Senate
President; STEVE CRISAFULLI,
in his official capacity as the
Florida Speaker of the House of
Representatives; and PAM
STEWART, in her official
capacity as Florida Commissioner
of Education,

        Appellees,

and

CELESTE JOHNSON;
DEAUNDRICE KITCHEN;
KENIA PALACIOS; MARGOT
LOGAN; KAREN TOLBERT; and
MARIAN KLINGER,

        Intervenors/Appellees.

_____/

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D16-2862

Opinion filed December 13, 2017.

An appeal from the Circuit Court for Leon County.
George S. Reynolds, Judge.

Jodi Siegel and Kirsten Anderson of Southern Legal Counsel, Inc., Gainesville; Timothy McLendon, Gainesville; Deborah Cupples, Gainesville; Eric J. Lindstrom of Egan, Lev & Siwica, P.A., Gainesville; Neil Chonin, Gainesville, for Appellants.

Robert M. Brochin and Clay M. Carlton of Morgan, Lewis & Bockius LLP, Miami, for Amicus Curiae Certain Commissioners of 1998 Constitution Revision Commission.

Dena H. Sokolow, Renee Meenach Decker and Angelica M. Fiorentino of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Orlando, for Amicus Curiae National Law Center on Homelessness & Poverty, and Amicus Curiae Bassuk Center on Homeless and Vulnerable Children and Youth.

Sarah R. Sullivan, Jacksonville, for Amicus Curiae Disability and Public Benefits Clinic, Florida Coastal School of Law.

Kele Stewart, Coral Gables, for Amicus Curiae University of Miami School of Law Children Youth Law Clinic.

Pamela Jo Bondi, Attorney General, Jonathan A. Glogau, Chief, Complex Litigation, Tallahassee; Dawn Roberts, General Counsel, and Christie M. Letarte, Deputy General Counsel, The Florida Senate, Tallahassee; Adam S. Tanenbaum, General Counsel, Florida House of Representatives, Tallahassee, for the Florida House of Representatives and Steve Crisafulli in his official capacity as the Speaker of the Florida House of Representatives; Judy Bone, General Counsel, Matthew H. Mears and Mari M. Presley, Assistant General Counsels, Department of Education, Tallahassee; Rocco E. Testani, Stacey M. Mohr and Lee A. Peifer of Sutherland Asbill & Brennan LLP, Atlanta, pro hac vice, for Appellees.

George N. Meros, Jr., of GrayRobinson, P.A., Tallahassee; Carl Nichols, Daniel P. Kearney, Jr. and Kevin Gallagher of Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for Amicus Curiae Foundation for Excellence in Education.

Ari S. Bargil, Institute for Justice, Miami; Richard Komer, Institute for Justice, Arlington, VA, pro hac vice; and Timothy D. Keller, Institute for Justice, Tempe, AZ, pro hac vice, for Intervenors/Appellees Institute for Justice.

B.L. THOMAS, C.J.

Eight years ago, Appellants initiated a legal challenge to Florida's public school system, asserting that the State's entire K-12 public education system – which includes 67 school districts, approximately 2.7 million students, 170,000 teachers, 150,000 staff members, and 4,000 schools – is in violation of the Florida Constitution. Appellants sued the Florida State Board of Education, the President of the Florida Senate, the Speaker of the Florida House of Representatives and the Florida Commissioner of Education seeking a declaration that the State violated its "paramount duty" to provide a "uniform, efficient . . . and high quality system of free public schools that allows students to obtain a high quality education," as required by Article IX, section 1(a) of the Florida Constitution. Appellants sought declaratory and supplemental relief below, including: a demand that the State submit a remedial plan for the alleged constitutional deficiencies; a demand that relevant studies be conducted for necessary actions; and that the trial court retain jurisdiction to provide any further appropriate legal relief.

We affirm the trial court's ruling denying relief on the basis that Appellants' arguments regarding the State's duty to make adequate provision for an efficient and high quality education raise political questions not subject to judicial review, because the relevant constitutional text does not contain judicially discoverable standards by which a court can decide whether the State has complied with organic law. Furthermore, the strict separation of powers embedded in Florida's organic law requires judicial deference to the legislative and executive branches to adopt and execute educational policies those branches deem necessary and appropriate to enable students to obtain a "high quality" education, as directed by the Florida Constitution. There is no language or authority in Article IX, section 1(a) that would empower judges to order the enactment of educational policies regarding teaching methods and accountability, the appropriate funding of public schools, the proper allowance of charter schools and school choice, the best methods of student accountability and school accountability, and related funding priorities.

The most effective manner in which to teach students science, mathematics, history, language, culture, classics, economics, trade skills, poetry, literature and civic virtue have been debated since at least the time of ancient Greece. Brilliant philosophers, thinkers, writers, poets and teachers over the past twenty-five centuries have dedicated their talents to identifying the best means of providing a proper education to help each child reach his or her highest potential in a just

society. In a republican form of government founded on democratic rule, it must be the elected representatives and executives who make the difficult and profound decisions regarding how our children are to be educated. Absent specific and clear direction to the contrary in the supreme organic law, which does not exist in Article IX, section 1(a) of the Florida Constitution, we uphold the trial court's correct ruling that such decisions are not subject to judicial oversight or interference.

We also affirm the trial court's ruling rejecting Appellant's arguments challenging the State's constitutional compliance with its duty to provide a "uniform" education. We agree that the John M. McKay Scholarship Program for Students with Disabilities – which affects only 30,000 students and does not materially impact the K-12 public school system – provides a benefit to help disabled students obtain a high quality education. Thus, the McKay Scholarship Program does not violate Article IX, section 1(a) of the Florida Constitution.

*Background and Procedural History*

In 2009, Appellants filed suit challenging the State's education policies as invalid under Article IX, section 1(a) of the Florida Constitution. Appellees moved to dismiss, asserting in part that the allegations raised political questions not subject to judicial review, and the motion was denied. Appellees then sought a writ of prohibition in this court, asserting that the claims were not justiciable, as

they raised political questions. Sitting en banc, this court voted 7-1-7 to deny the petition for writ of prohibition and allowed the litigation to continue in the trial court. *Haridopolos v. Citizens for Strong Schools Inc.,* 81 So. 3d 465, 467 (Fla. 1st DCA 2011) (en banc). The en banc court certified as an issue of great public importance the following question:

> Does Article IX, section 1(a), Florida Constitution, set forth judicially ascertainable standards that can be used to determine the adequacy, efficiency, safety, security, and high quality of public education on a statewide basis, so as to permit a court to decide claims for declaratory judgment (and supplemental relief) alleging noncompliance with Article IX, section 1(a) of the Florida Constitution?

*Id.* at 473. The dissenting judges would have granted the writ, based on the separation of powers requirement of Article II, section 3 of the Florida Constitution and the political question doctrine. *Id.* at 480-81 (Roberts, J., dissenting). The Florida Supreme Court declined to accept jurisdiction to consider the certified question. *Haridopolos v. Citizens for Strong Schools Inc.,* 103 So. 3d 140 (Fla. 2012) (unpublished table decision).

Appellants then filed a second amended complaint, alleging that the State's legislative and executive branches had violated their "paramount duty" to provide a "uniform, efficient . . . and high quality system of free public schools that allows students to obtain a high quality education" under Article IX, section 1(a), in several respects: (1) the State failed to make "adequate provision" for a system of

6

free public schools, because the overall level of funding for education is deficient; (2) the State failed to administer a "uniform" system of education, because two school choice programs, the Florida Tax Credit Scholarship Program and the John M. McKay Scholarship Program for Students with Disabilities (the McKay Scholarship Program), divert public funds to private schools not subject to the same requirements as public schools;[1] (3) the State failed to provide an "efficient" education system, because the accountability methods utilized by the State are ineffective and because charter schools are mismanaged; (4) the State failed to provide a "high quality" education system because schools provide insufficient services and coursework and have an insufficient number of highly qualified teachers and support staff; and (5) the public school system did not allow students to obtain a high quality education, based on various assessments.[2]

After extensive pre-trial discovery, a four-week bench trial was conducted by the successor circuit judge, in which more than forty witnesses testified and over 5,300 exhibits were submitted. The court made comprehensive findings on a

---

[1] The trial court allowed six parents interested in the Florida Tax Credit Scholarship Program and the McKay Scholarship Program to intervene in the proceedings. The trial court later granted their motion for judgment on the pleadings as to the Florida Tax Credit Scholarship Program, finding that Appellants lacked standing to challenge that program.

[2] The second amended complaint also added a claim relating to the State's pre-kindergarten program. The trial court severed that claim, and it is not at issue in this appeal.

broad range of subjects, including: the structure of Florida's education system; the various policies and programs implemented by the State to achieve its educational goals; the funding allocated for these programs; and student performance – overall and by various demographics – under state and national assessments and other measures. Ultimately, however, the trial court found all of the issues raised by Appellants regarding educational adequacy, efficiency, and quality were properly considered "political questions best resolved in the political arena," as the organic law did not provide judicially manageable standards by which to measure the State's actions in enacting and implementing educational policies, as the dissenting judges on this court concluded in 2011.[3]

The trial court nevertheless addressed Appellants' arguments on the merits, concluding that the State had made significant efforts and advances in education, leading to sustained improvement on outcomes for Florida students:

> [T]he State has made education a top priority both in terms of implementation of research-based education policies and reforms, as well as education funding. The State has an accountability and assessment system that is rated among the best in the nation . . . . The State has also adopted rigorous teacher certification, training and

---

[3] As to "safe" and "secure," the trial court ruled that these terms are subject to judicially manageable standards, but that Appellants had withdrawn any challenge to the safety or security of the public school system before trial. The court found that these issues were nonetheless tried with regard to the adequacy of funding to meet repair and maintenance needs, but that the evidence submitted did not demonstrate insufficient funding for these needs. As we hold that the overarching question of adequacy is not justiciable, we do not opine on the trial court's conclusion in this regard.

8

evaluation standards, resulting in over 94% of courses being taught by teachers who are 'highly qualified' under federal standards.

In addition, the court found that in the last two decades, "K-12 education has been the single largest component of the state general revenue budget. . . . [E]ducation funding has outpaced inflation." The court further found that Florida's high school graduation rate has dramatically improved, "with more students of all racial, ethnic and socioeconomic backgrounds graduating than ever before," and that "Florida students have substantially improved their performance on the National Assessment of Education Progress . . . a testing program required by federal and state law [and] . . . Florida is now among the highest scoring states in the nation." The trial court thus ruled that Appellants had failed to demonstrate beyond a reasonable doubt that the State's education policies and funding were not rationally related to fulfilling its constitutional duty under Article IX, section 1(a) of the Florida Constitution. As to Appellants' challenge to the McKay Scholarship Program, the court concluded the evidence did not support their allegations that the program violated the uniformity requirements of Article IX, section 1(a).

*Analysis*

Appellants argue that the issues raised do not present a political question, and additionally, that the trial court applied the wrong standard to determine whether the State had complied with Article IX, section 1(a) of the Florida Constitution. Thus, Appellants would have the judicial branch determine:

9

1) Whether the other two branches of state government have made adequate provision for the public school system; (2) whether the system is uniform, efficient, and of high quality; and (3) whether the system allows students to obtain a high quality education. We agree with the trial court that the terms "adequate," "efficient," and "high quality" as used in Article IX, section 1(a) lack judicially discoverable or manageable standards that would allow for meaningful judicial interpretation, and that an attempt to evaluate the political branches' compliance with the organic law would constitute a violation of Florida's strict requirement of the separation of powers. We therefore affirm the trial court's determination that these issues are non-justiciable, as discussed below.

The concept of a political question as nonjusticiable was comprehensively defined by the United States Supreme Court in *Baker v. Carr,* 369 U.S. 186 (1962), and adopted in *Coalition for Adequacy and Fairness in School Funding, Inc. v. Chiles,* 680 So. 2d 400, 408 (Fla. 1996). In *Baker,* the United States Supreme Court discussed the political-question doctrine at length, including its jurisprudential foundation, logic, and analysis: "We have said that 'In determining whether a question falls within (the political question) category, the appropriateness under our system of government of attributing *finality* to the action of the political departments and also the *lack of satisfactory criteria* for a judicial determination are *dominant considerations*.'" 369 U.S. at 211 (emphasis added)

10

(quoting *Coleman v. Miller*, 307 U.S. 433, 454-455 (1939)). There could be no more relevant standard applicable here than the importance of finality, in a case consuming almost a decade of litigation and demonstrating the lack of finality inherent in an attempt to litigate such a complex political dispute. The demand for finality in complex public-policy questions is obvious, as legislative and executive decisions involving billions of dollars and multiple demographic, fiscal and logistical factors must be promptly implemented and then consistently reevaluated. Such a process is clearly not compatible with extensive civil litigation that consumes years in the court system, unlike political decisions, which in Florida are made in an annual 60-day legislative session, during and after which the governor can veto or acquiesce in those decisions and then execute them in the next fiscal year. Finality is inextricably intertwined with the perspective that such profound questions – such as those involved in adopting and executing education policies for millions of K-12 students – must necessarily be performed exclusively within the political branches, which by their nature are far more responsive and prompt to address the needs of parents and students than the courts could ever be.

The second "dominant consideration" cited by the United States Supreme Court in deciding whether a case involves an inherently political question is the "lack of satisfactory criteria." *Id.* This is linked to finality, because the lack of specificity in an operative legal text lends itself to endless litigation over the

11

meaning of subjective and undefined phrases that might function to give guidance to political decision makers as laudable goals, but cannot guide judges in deciding whether a state or local government has in fact complied with the text. Without "satisfactory criteria" to channel discretion in judicial rulings, litigation involving a subjective advisory guideline invites arbitrary and capricious judicial actions which improperly invade the spheres of action of the political branches.

In *Baker,* the Supreme Court provided various "formulations" to be used in deciding whether a case raised a political question not subject to judicial review, stating that "each has one or more elements which identify it as essentially a function of the *separation of powers.*" *Id*. at 217 (emphasis added). As analyzed below, Florida requires a strict separation of powers under Article II, section 3 of its organic law. The Court then repeated its view that the lack of objectively ascertainable standards was "prominent" in finding a legal claim to be nonjusticiable, but the court also ruled that "a textually demonstrable constitutional commitment of the issue to a coordinate political department" would constitute strong evidence that the issue was not to be decided by the courts, but instead by another branch of government. *Id*.

In *Coalition*, a case involving the previous iteration of Article IX, section 1, the Florida Supreme Court addressed arguments similar to those raised here, that "the State has failed to provide its students [the] fundamental right" of an adequate

education." 680 So. 2d at 402. In support of their argument, the plaintiffs alleged that students were not receiving adequate programs "to permit them to gain proficiency in the English language," that poor students were "not receiving adequate education for their greater educational needs," that special-needs students and gifted students were "not receiving adequate special programs," that students in "property-poor counties" were not receiving "an adequate education," that the legislature had not provided adequate capital outlay funds for schools, and that local school districts were "unable to perform their constitutional duties because of the legislative imposition of noneducational and quasi-educational burdens." *Id*. In essence, the supreme court faced a blanket challenge to the adequacy of the education system under a prior version of Article IX, section 1.[4] *Id*. at 406.

Applying the criteria in *Baker*, the supreme court determined that "adequacy" was a non-justiciable political question, because the phrase "by law" suggested the issue was committed to the legislature and because – unlike "uniform" – "'adequacy' simply does not have such straightforward content." *Id*. at 408. While the supreme court declined to hold that an adequacy challenge to the education system could *never* succeed, it concluded that the *Coalition* plaintiffs

---

[4] At the time of the *Coalition* decision, Article IX, section 1, stated: "Adequate provision shall be made by law for a uniform system of free public schools and for the establishment, maintenance and operation of institutions of higher learning and other public education programs that the needs of the people may require." Art. IX, § 1, Fla. Const. (1996).

13

failed to demonstrate any manageable standards that could be applied without "a substantial risk of judicial intrusion into the powers and responsibilities assigned to the legislature." *Id.*

Following that decision, the 1997-1998 Constitution Revision Commission proposed, and the voters adopted, an amendment to the education provision, which now states:

> The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education . . . .

Art. IX, §1(a), Fla. Const.

We agree with the trial court that the terms "efficient" and "high quality" are no more susceptible to judicial interpretation than "adequate" was under the prior version of the education provision, and to define these terms would require "an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217; *see also Coalition*, 670 So. 2d at 408. Our conclusion is further supported by Florida's strict separation of powers doctrine and by the language of the amended constitutional article itself, which continues to commit the duty to achieve these aspirational goals to the legislative and executive branches of government.

Turning first to the separation of powers, the Florida Constitution imposes a

14

"strict" separation of powers requirement that applies just as vigorously to the judicial branch as it does to the other two branches of government. *State v. Cotton,* 769 So. 2d 345 (Fla. 2000). In *Cotton,* the supreme court rejected the argument that the Prison Releasee Reoffender Punishment Act violated the separation of powers provision of Article II, section 3 of the Florida Constitution, holding that because substantive sentencing laws and prosecutorial discretion were vested in the legislative and executive branches respectively, the law imposing mandatory sentences based solely on prosecutorial discretion did not interfere with judicial power. *Id.* at 349-54. In explaining its rationale, the supreme court disagreed with the single dissenting opinion, which relied on New Jersey law that permitted judicial oversight of the executive function of prosecutorial discretion. *Id.* at 352-54. In rejecting the dissenting opinion's view, the majority in *Cotton* noted that Florida's organic law imposes a "strict" separation of powers between the branches of government:

> This Court, on the other hand, in construing the Florida Constitution, has traditionally applied a strict separation of powers doctrine. *Cf. Avatar Dev. Corp. v. State,* 723 So. 2d 199, 201 (Fla. 1998) (recognizing, in the context of a nondelegation analysis, that "[a]rticle II, section 3 declares a *strict separation of the three branches of government* and that: "No person belonging to one branch shall exercise any powers appertaining to either of the other two branches"(emphasis supplied)). In applying a strict separation of powers doctrine (as the Florida Constitution requires), rather than a doctrine effecting the "dispersal of decisional responsibility in the exercise of

15

each power" (as the New Jersey constitution apparently requires), this Court is compelled to reach a different result. If we were to apply the New Jersey "dispersal of decisional responsibility" concept here, we would be deviating from well-established principles of Florida law, *which would have impact far beyond matters relating to prosecutorial decisions.*

*Id.* at 353-54 (second emphasis added) (quoting *State v. Lagares*, 601 A.2d 698 (1992)).

A strict separation of powers supports the foundation and logic of the political-question doctrine, in that Florida's organic law does not permit a "dispersal of decisional responsibility" which would allow the courts to dictate educational policy choices and their implementation to the other two branches of government, absent specific authorization by law. *Id.* Absent explicit constitutional authority to the contrary, the legislative and executive branches possess exclusive jurisdiction in such matters, as the legislative branch has sole power to appropriate and enact substantive policy, and the executive branch has the sole power to faithfully execute the substantive policies and budgetary appropriations enacted by the legislative branch. The judiciary cannot dictate the manner of executing legislative policies or appropriations in any particular way. *See* Art. II, § 3, Fla. Const. ("No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein."); Art. V, § 14(d), Fla. Const. ("The judiciary shall have no power to fix

16

appropriations.”).

To agree with Appellants would entangle courts in the details and execution of educational policies and related appropriations, involving millions of students and billions of dollars, in an arena in which the courts possess no special competence or specific constitutional authority. Further, the drafters of Article IX, section 1(a) declined to allocate such a role to the judiciary. Quite the opposite, the language of Article IX, section 1(a) assigns such matters to the legislative branch, stating that "adequate provision shall be made *by law*." Art. IX, § 1(a), Fla. Const. (emphasis added). The fact that this language remains in the education amendment after *Coalition* demonstrates that the constitution continues to commit education policy determinations to the legislative and executive branches. *See Coalition*, 670 So. 2d at 408.

Further, as the trial court recognized here, the lack of any definitive consensus regarding education policies and programs demonstrates the political nature of Appellants' assertions. While "adequate," "efficient," and "high quality" represent worthy *political* aspirations, they fail to provide the courts with sufficiently objective criteria by which to measure the performance of our co-equal governmental branches. Rather, it is the political branches that must give meaning to these terms in accordance with the policy views of their constituents. For these reasons, Appellants failed to demonstrate any meaningful standards under which

17

the courts could find that the State has violated its constitutional duties regarding the adequacy, efficiency and quality of the public school system.[5]

Looking to a similar case in another state, we agree with the conclusion of the Pennsylvania Supreme Court that it would be contrary to the very essence of our constitution's educational aspirations for the courts to "'bind future Legislatures . . . to a present judicial view'" of adequacy, efficiency, and quality. *Marrero ex rel. Tabalas v. Commonwealth of Penn.*, 739 A.2d 110, 112 (1999) (quoting *Danson v. Casey*, 399 A.2d 360, 366-67 (1979)); *see also Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 522 (Ind. 2009) (denying declaratory relief because the determination of quality "is delegated to . . . sound legislative discretion"). And although we recognize that courts in other states have sometimes purported to define "adequate," "efficient," "high quality," and similar terms in response to challenges to their own public school systems, *see, e.g.*, *Connecticut Coalition for Justice in Education Funding, Inc. v. Rell*, 990 A.2d 206 (2010)

---

[5] As to the trial court's additional finding that, even if the issue is not a political question assigned solely to the political branches, Appellants failed to meet their burden to prove "beyond a reasonable doubt that the State's education policies and funding system were not rationally related to the provision 'by law' for a 'uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education," Appellants contend the trial court applied an overly stringent standard. Appellants urge this court to hold that a lower burden of proof and standard for evaluating the constitutionality of the State's actions should apply in this case and in all cases challenging the State's compliance with its obligations under Article IX of the Florida Constitution. We decline to do so, based on our holding that these claims are not justiciable.

(concluding the state did not provide "suitable" educational opportunities); *Columbia Falls Elementary School District No. 6 v. State*, 109 P.3d 257 (Mont. 2005) (holding that funding for education was inadequate and that determination of "quality" education was justiciable, but deferring to state legislature to provide threshold definition of "quality"); *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186 (Ky. 1989) (concluding that the legislative branch failed to comply with the constitutional requirement of providing an "efficient system of common schools"), we respectfully disagree with those decisions as insufficiently deferential to the fundamental principle of separation of powers imposed on Florida's judiciary and the practical reality that educational policies and goals must evolve to meet ever changing public conditions, which is precisely why only the legislative and executive branches are assigned such power. The New Jersey Supreme Court, for example, while concluding that the legislature failed to comply with its constitutional requirement of a "thorough and efficient" system of free public schools, observed that "what a thorough and efficient education consists of *is a continually changing concept*." *Abbot v. Burke*, 575 A.2d 359, 367 (N.J. 1990) (emphasis added). That court further acknowledged the "radical interference with the legislative power" involved in determining that the educational system provided in New Jersey was constitutionally deficient. *Id.* at 376. As noted by our supreme court in *Cotton,* Florida law is much more protective of the separation of

19

powers principle than is New Jersey law. Like the Florida Supreme Court noted in *Coalition*, although "the views of other courts are always helpful, we conclude that the dispute here must be resolved on the basis of Florida constitutional law[.]" 680 So. 2d at 404-05.

With respect to a "uniform" system of public schools, Appellants alleged in their second amended complaint that two of Florida's school choice programs, the Florida Tax Credit Scholarship Program and the McKay Scholarship Program, violate this requirement. Unlike the terms adequate, efficient and high quality, the Florida Supreme Court has interpreted the term "uniform" under Article IX in the context of school choice programs. *See Bush v. Holmes*, 919 So. 2d 392 (Fla. 2006). As Appellants properly concede, however, the trial court's ruling that they lack standing to challenge the Florida Tax Credit Scholarship Program is controlled by this court's opinion in *McCall v. Scott*, 199 So. 3d 359 (Fla. 1st DCA 2016) (holding that appellant parents and teachers lacked taxpayer standing to challenge the Florida Tax Credit Scholarship Program, because it did not violate a specific limitation on the legislature's taxing and spending power, nor did it involve a disbursement from the public treasury). Therefore, the sole uniformity claim on appeal relates to the McKay Scholarship Program.

Appellants argue that the McKay Scholarship Program violates Article IX, because it diverts public funds to private schools, which are not subject to the same

20

standards and oversight as public schools.  They rely on *Holmes,* in which the Florida Supreme Court held that another school choice program, the Opportunity Scholarship Program, violated the constitutional requirement that education be provided through a uniform system of public schools.  *Holmes*, 919 So. 2d at 413. However, in disapproving the Opportunity Scholarship Program, which allowed *any* student attending a failing school to use a scholarship provided by the State to attend a private school, the *Holmes* court expressly disavowed that its decision would necessarily impact other more specialized educational programs, even if those programs used public funds to pay for a private school education:

> We reject the suggestion by the State and amici that other publicly funded educational and welfare programs would necessarily be affected by our decision. Other educational programs, such as the program for exceptional students at issue in *Scavella [v. School Board of Dade County*, 363 So. 2d 1095 (Fla. 1978)], are structurally different from the [Opportunity Scholarship Program], which provides a systematic private school alternative to the public school system mandated by our constitution.

919 So. 2d at 412.

Here, like the program at issue in *Scavella*, the McKay Scholarship Program is a specialized scholarship limited to students with disabilities.  *See* § 1002.39(2), Fla. Stat. (outlining eligibility requirements for the McKay Scholarship Program); *Scavella*, 363 So. 2d 1098 (describing a program through which exceptional students used public funds to attend private schools).  The trial court correctly recognized that this opportunity for students with disabilities involved only

21

approximately 30,000 of the total 2.7 million students in the public schools, and only a fraction of the statewide K-12 public school budget, such that it could not be reasonably argued that the McKay Scholarship Program had a "material affect" on the public K-12 education system. Rather, as the trial court observed, "evidence was presented that [this] school-choice program[] [is] reasonably likely to improve the quality and efficiency of the entire system."

The McKay Scholarship Program offers a beneficial option for disabled students to help ensure they can have a "high quality" education. As the trial court recognized, "research has shown that the McKay program has a positive effect on the public schools, both in terms of lessening the incentive to over-identify students and by increasing the quality of services of the students with disabilities in the public schools." It is difficult to perceive how a modestly sized program designed to provide parents of disabled children with more educational opportunities to ensure access to a high quality education could possibly violate the text or spirit of a constitutional requirement of a uniform system of free public schools.

*Conclusion*

Thus, we affirm the trial court's ruling that Appellants' claims must be rejected, as those claims either raise political questions not subject to judicial review or were correctly rejected on the merits.

22

AFFIRMED.

WINOKUR, J., CONCURS; WOLF, J., SPECIALLY CONCURRING WITH OPINION.

WOLF, J., specially concurring.

In Haridopolos v. Citizens for Strong Schools, Inc., 81 So. 3d 465 (Fla. 1st DCA 2011) (en banc), eight judges (a majority of the court) determined that article IX, section 1 of the Florida Constitution did not contain adequate standards by which the judiciary could measure whether the Legislature complied with the terms of the constitutional provision. In my concurring opinion, I agreed with the majority that the case needed to be remanded to the trial court. However, I agreed with the seven dissenting judges that the amendment lacked measureable standards and stated:

> Clearly, it was the intent of the Constitutional Revision Commission that drafted the 1998 amendment to article IX, section 1 of the Florida Constitution to address the decision in Coalition, 680 So. 2d 400, by adding language to further elucidate the public's desires concerning the public education system. Unfortunately, this language still did not provide measurable goals by which the court could judge legislative performance and enforce the provision in any particular manner. This case is similar to Advisory Opinion to the Governor - 1996 Amendment 5 (Everglades), 706 So. 2d 278, 279 - 82 (Fla. 1997), where the public expressed its strong desire that polluters be "primarily responsible" for cleaning up the Everglades, yet the court held the amendment was not self-executing. Similarly, the public's desires here are not sufficiently definite to allow for enforcement without some measurable standards.

Haridopolos, 81 So. 3d at 474 (Wolf, J., concurring) (emphasis added).

The trial in this case demonstrated that without measureable standards, there is no way that a trial court can assess whether the Legislature has complied with article IX, section 1 of the Florida Constitution. Both sides presented numerous

24

statistics to support their position, with each side taking different views about which statistical categories best measured compliance with the amendment. The trial court did an admirable job of sorting through the mountain of evidence presented to it. The bottom line is that without measureable standards, the plaintiffs cannot demonstrate that the Legislature has violated constitutional standards.

As I expressed in my original concurring opinion in this case, a litigant may have a cause of action to require the Legislature to implement article IX, section 1 through the adoption of reasonable measurable standards to gauge compliance. The plaintiffs in this case chose not to pursue that remedy. I, therefore, concur.